Roberto Romero LAMA, et al.,
Plaintiffs, Appellees,

v.

Dr. Pedro J. BORRAS, et al.,
Defendants, Appellees.

Asociacion Hospital Del Maestro,
Inc. Defendant, Appellant.

Roberto Romero LAMA, et al.
Plaintiffs, Appellees,

v.

Dr. Pedro J. BORRAS, et al.,
Defendants, Appellants.

Nos. 93–1071, 93–1072.

United States Court of Appeals,
First Circuit.

Heard Sept. 10, 1993.

Decided Feb. 25, 1994.

Alvaro R. Calderon, Jr. with whom Alvaro R. Calderon, Jr. Law Offices, Hato Rey, PR, were on brief for appellant Borras, et al.

Fernando J. Fornaris with whom Luis Berrios Amadeo, and Cancio, Nadal & Rivera, San Juan, PR, were on brief for appellant Asociacion Hospital Del Maestro, Inc.

Harold D. Vicente with whom Vicente & Cuebas, Santurce, PR, were on brief for appellee.

Before STAHL, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.

STAHL, Circuit Judge.

Defendants-appellants Dr. Pedro Borras[1] and Asociacion Hospital del Maestro, Inc. (Hospital) appeal from a jury verdict finding them liable for medical malpractice to plaintiffs Roberto Romero Lama (Romero) and his wife, Norma.[2] Defendants principally argue that the district court erred in denying their post-verdict motions for judgment as a matter of law under Fed.R.Civ.P. 50(b) because the evidence at trial was legally insufficient to prove the prima facie elements of negligence. For the same reason, the Borras Defendants also argue that the court erred in denying their motion for a new trial pursuant to Fed.R.Civ.P. 59. Finding no error, we affirm.

## I.

### BACKGROUND

Since the jury found defendants liable, we recount the facts in the light most favorable to plaintiffs, drawing all reasonable inferences in their favor; we do not evaluate the credibility of witnesses or the weight of the evidence. *Santiago–Negron v. Castro–Davila*, 865 F.2d 431, 445 (1st Cir.1989); *Forrestal v. Magendantz*, 848 F.2d 303, 305 (1st Cir.1988); *Computer Sys. Eng'g v. Qantel Corp.*, 740 F.2d 59, 65 (1st Cir.1984).

In 1985, Romero was suffering from back pain and searching for solutions. Dr. Nancy Alfonso, Romero's family physician, provided some treatment but then referred him to Dr. Borras, a neurosurgeon. Dr. Borras concluded that Romero had a herniated disc and scheduled surgery. Prior to surgery, Dr. Borras neither prescribed nor enforced a regime of absolute bed rest, nor did he offer other key components of "conservative treatment." Although Dr. Borras instructed Romero, a heavy smoker, to enter the hospital one week before surgery in order to "clean out" his lungs and strengthen his heart, Romero was still not subjected to standard conservative treatment.

While operating on April 9, 1986, Dr. Borras discovered that Romero had an "extruded" disc and attempted to remove the extruding material. Either because Dr. Borras failed to remove the offending material or because he operated at the wrong level, Romero's original symptoms returned in full force several days after the operation. Dr. Borras concluded that a second operation was necessary to remedy the "recurrence."

Dr. Borras operated again on May 15, 1986. Dr. Borras did not order pre- or post-operative antibiotics. It is unclear whether the second operation was successful in curing the herniated disc. In any event, as early as May 17, a nurse's note indicates that the bandage covering Romero's surgical wound was "very bloody," a symptom which, according to expert testimony, indicates the possibility of infection. On May 18, Romero was experiencing local pain at the site of the incision, another symptom consistent with an infection. On May 19, the bandage was "soiled again." A more complete account of Romero's evolving condition is not available because the Hospital instructed nurses to

---

1. In addition to Dr. Borras, his wife and their conjugal partnership were also named as defendants. We refer to these three parties collectively as "the Borras Defendants."

2. Corporacion Insular de Seguros, Dr. Borras' insurer, was also found liable but is not a party to this appeal.

engage in "charting by exception," a system whereby nurses did not record qualitative observations for each of the day's three shifts, but instead made such notes only when necessary to chronicle important changes in a patient's condition.[3]

On the night of May 20, Romero began to experience severe discomfort in his back. He passed the night screaming in pain. At some point on May 21, Dr. Edwin Lugo Piazza, an attending physician, diagnosed the problem as discitis—an infection of the space between discs—and responded by initiating antibiotic treatment. Discitis is extremely painful and, since it occurs in a location with little blood circulation, very slow to cure. Romero was hospitalized for several additional months while undergoing treatment for the infection.

After moving from Puerto Rico to Florida, the Romeros filed this diversity tort action in United States District Court for the District of Puerto Rico.[4] Plaintiffs alleged that Dr. Borras was negligent in four general areas: (1) failure to provide proper conservative medical treatment; (2) premature and otherwise improper discharge after surgery; (3) negligent performance of surgery; and (4) failure to provide proper management for the infection. While plaintiffs did not claim that the Hospital was vicariously liable for any negligence on the part of Dr. Borras, they alleged that the Hospital was itself negligent in two respects: (1) failure to prepare, use, and monitor proper medical records; and (2) failure to provide proper hygiene at the hospital premises.

At each appropriate moment, defendants attempted to remove the case from the jury. Before trial they moved for summary judgment. *See* Fed.R.Civ.P. 56. At the close of plaintiffs' case and at the close of all the evidence, defendants moved for judgment as a matter of law. *See* Fed.R.Civ.P. 50(a). After the jury returned a verdict awarding plaintiffs $600,000 in compensatory damages, defendants again sought judgment as a matter of law. *See* Fed.R.Civ.P. 50(b). Additionally, the Borras Defendants requested either a new trial or remittitur. *See* Fed. R.Civ.P. 50(b) and 59. At each procedural step and with respect to each allegation of negligence, defendants' primary argument was that plaintiffs had failed to establish the required elements of duty, breach, and causation.

The district court rebuffed all of defendants' entreaties, ruling that the evidence was legally sufficient to fuel the jury's deliberations and ultimately to support its findings. Because our analysis necessarily focuses on the denial of the post-verdict motions for judgment as a matter of law,[5] we

---

3. Notwithstanding the "charting by exception" policy, nurses regularly recorded routine quantitative data such as the patient's body temperature. Romero apparently did not develop a fever (another possible sign of infection) until May 21.

4. In addition to the Borras Defendants and the Hospital, plaintiffs named as defendants several other physicians, as well as their spouses and insurers. The district court granted summary judgment in favor of the other defendants and that decision is not at issue in this appeal.

5. We do not directly address the merits of the Borras Defendants' pre-verdict challenges to the sufficiency of the evidence. The Borras Defendants' attack on the denial of summary judgment has been overtaken by subsequent events, namely, a full-dress trial and an adverse jury verdict. In these circumstances, we will not address the propriety of the denial of summary judgment. *See Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1250 (10th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993); *Bottineau Farmers Elevator v. Woodword–Clyde Consultants,* 963 F.2d 1064, 1068 n. 5 (8th Cir.1992); *Jarrett*

*v. Epperly,* 896 F.2d 1013, 1016 & n. 1 (6th Cir.1990); *Holley v. Northrop Worldwide Aircraft Servs., Inc.,* 835 F.2d 1375, 1378 (11th Cir.1988) ("[A] party may not rely on the undeveloped state of the facts at the time [the party] moves for summary judgment to undermine a fully-developed set of trial facts which militate against [the party's] case."); *Locricchio v. Legal Servs. Corp.,* 833 F.2d 1352, 1358–59 (9th Cir.1987); *Glaros v. H.H. Robertson Co.,* 797 F.2d 1564, 1573 (Fed. Cir.1986), *cert. dismissed,* 479 U.S. 1072, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987). *But see Trustees of Indiana Univ. v. Aetna Casualty & Sur. Co.,* 920 F.2d 429, 433 (7th Cir.1990) (addressing denial of summary judgment even after an adverse jury verdict). Were we to consider the issue, we would find the Borras Defendants' position to be without merit. For similar reasons, we do not separately address the district court's denial of the Borras Defendants' Rule 50(a) motion for judgment as a matter of law, which is either non-appealable at this stage or resolved by our affirmance of the denial of defendants' Rule 50(b) motions. *See Locricchio,* 833 F.2d at 1356 n. 2.

quote at length from the district court's order denying those motions:

> In reference to Dr. Borras, the evidence, seen in the light most favorable to the plaintiffs, allowed the jury *to at least conclude* that Dr. Borras failed to pursue a well-planned and managed, conservative treatment course for Roberto Romero Lama's back ailment before exposing him to the inherent dangers of a herniated disc operation. Had such conservative treatment been successful, then the post-surgical complications that unfortunately took place in the operated vertebral interspace [including the infection following the second surgery] would not have occurred. A reasonable jury could have concluded that the negligent act was the recommendation of a first operation without the benefit of additional conservative treatment....
>
> As to Hospital del Maestro, it was entirely possible for the jury to conclude that the particular way in which the medical and nursing records were kept constituted evidence of carelessness in monitoring the patient after the second operation. Perhaps the infection would have been reported and documented earlier. Perhaps the hospital was negligent in not dealing appropriately with wound inspection and cleaning, [and] bandage changing....

*Romero Lama v. Borras,* No. 91–1055, slip op. at 1–2, 1992 WL 584068 (D.P.R. Sept. 1, 1992) (order denying post-verdict motions). We find the reasoning of the district court to be substantially sound and therefore affirm the result.

## II.

### STANDARD OF REVIEW

■ Our review of a denial of a post-verdict motion for judgment as a matter of law is plenary, yet highly circumscribed by the deferential Rule 50(b) standard. *See Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d 74, 77 (1st Cir.1993). We must sustain the district court's denial of a Rule 50(b) motion for judgment as a matter of law, "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." *PH Group Ltd. v. Birch,* 985 F.2d 649, 653 (1st Cir.1993).

■ The standard of review for denial of a Rule 59 motion for new trial is similarly circumscribed, but counsels ample deference to the district court's exercise of discretion. There is no abuse of discretion in such a case unless "the verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." *Id.* (citations and quotations omitted).

■ The Borras Defendants correctly argue that the district court *may* order a new trial even where the verdict is supported by substantial evidence. *E.g., Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987) (citing *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 200 (1st Cir.1980)); *see generally* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 2805–2810, at 37–77 (1973) (describing traditional alternative grounds for new trial, including errors of law as well as misconduct on the part of court, counsel, or jury). However, there is no rule that the district court *must* do so. Indeed, we have noted that, where the verdict rests on substantial evidence, it is " 'only in a very unusual case' " that we will find that the district court abused its discretion by denying a new trial. *Wagenmann,* 829 F.2d at 200 (quoting *Hubbard,* 626 F.2d at 200 and *Sears v. Pauly,* 261 F.2d 304, 309 (1st Cir.1958)). In other words, when an argument that the evidence was insufficient forms the basis of a motion for new trial, the district court is generally well within the bounds of its discretion in denying the motion using the same reasoning as in its denial of a motion for judgment as a matter of law. *See Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 740 (1st Cir.1982), *cert. denied,* 459 U.S. 1105, 1204, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). In these circumstances, then, our review of the denial of a Rule 50 motion is essentially coterminous with our review of the denial of a Rule 50(b) motion. *See id.*

## III.

### DISCUSSION

A. *Medical Malpractice under Puerto Rico Law*

■ We begin our analysis by laying out the substantive law of Puerto Rico governing

this diversity suit.[6] To establish a prima facie case of medical malpractice in Puerto Rico, a plaintiff must demonstrate: (1) the basic norms of knowledge and medical care applicable to general practitioners or specialists; (2) proof that the medical personnel failed to follow these basic norms in the treatment of the patient; and (3) a causal relation between the act or omission of the physician and the injury suffered by the patient. *Sierra Perez v. United States*, 779 F.Supp. 637, 643 (D.P.R.1991); *see also Rolon–Alvarado*, 1 F.3d at 77 & n. 2 (describing elements of medical malpractice in Puerto Rico and noting similarity with other jurisdictions).

■ The burden of a medical malpractice plaintiff in establishing the physician's duty is more complicated than that of an ordinary tort plaintiff. Instead of simply appealing to the jury's view of what is reasonable under the circumstances, a medical malpractice plaintiff must establish the relevant national standard of care. *See Rolon–Alvarado*, 1 F.3d at 77. In adopting a national standard, the Supreme Court of Puerto Rico explained that physicians are required to provide "[t]hat [level of care] which, recognizing the modern means of communication and education, ... meets the professional requirements generally acknowledged by the medical profession." *Oliveros v. Abreu*, 101 P.R.Dec. 209, 226, 1 P.R.Sup.Ct.Off'l Translations 293, 313 (1973).

■ Naturally, the trier of fact can rarely determine the applicable standard of care without the assistance of expert testimony. *Rolon–Alvarado*, 1 F.3d at 78 (citing *Oliveros*, 1 P.R.Sup.Ct.Off'l Translations at 315). The predictable battle of the experts then creates a curious predicament for the fact-finder, because an error of judgment regarding diagnosis or treatment does not lead to liability when expert opinion suggests that the physician's conduct fell within a range of acceptable alternatives. *See Sierra Perez*, 779 F.Supp. at 643–44; *Cruz Rodriguez v. Corporacion de Servicios del Centro Medico de Puerto Rico*, 113 P.R.Dec. ___, ___, 13 P.R.Sup.Ct.Off'l Translations 931, 946 (1983); *Oliveros*, 1 P.R.Sup.Ct.Off'l Translations at 315 (holding that physician is not liable for malpractice when there is "educated and reasonable doubt" about the appropriate course). While not allowed to speculate, the fact-finder is of course free to find some experts more credible than others. *See, e.g., Waffen v. United States Dep't of Health & Human Servs.*, 799 F.2d 911, 921 (4th Cir. 1986) (applying Maryland law; noting that the fact-finder in a medical malpractice case is entitled to decide the weight and credibility of expert testimony); *Rosario v. United States*, 824 F.Supp. 268, 279 (D.Mass.1993) (applying Massachusetts law; similar) (citing *Leibovich v. Antonellis*, 410 Mass. 568, 572, 574 N.E.2d 978, 982 (1991)).

■ Proof of causation is also more difficult in a medical malpractice case than in a routine tort case because a jury must often grapple with scientific processes that are unfamiliar and involve inherent uncertainty. A plaintiff must prove, by a preponderance of the evidence, that the physician's negligent conduct was the factor that "most probably" caused harm to the plaintiff. *Sierra Perez*, 779 F.Supp. at 643; *Cruz Rodriguez*, 13 P.R.Sup.Ct.Off'l Translations at 960. "This fact need not be established with mathematical accuracy[;] neither must all other cause of damage be eliminated." *Cruz Rodriguez*, 13 P.R.Sup.Ct.Off'l Translations at 960–61 (citations omitted). As in the case of duty, however, a jury normally cannot find causation based on mere speculation and conjecture; expert testimony is generally essential. *See, e.g., Johns v. Jarrard*, 927 F.2d 551, 557 (11th Cir.1991) (applying Georgia law; observing that medical malpractice plaintiff must usually present expert medical testimo-

---

**6.** First Circuit Local Rule 30.7 provides that " '[w]henever an opinion of the Supreme Court of Puerto Rico is cited in a brief ... [and] does not appear in the bound volumes in English, an official, certified or stipulated translation thereof with three conformed copies shall be filed.' " *Rolon–Alvarado*, 1 F.3d at 77 n. 1. As in *Rolon–Alvarado*, the parties to this appeal have not furnished translations of such cases. In the future, we may commission unofficial translations and impose on the offending parties the costs incurred and, where appropriate, sanctions. Failure to follow Rule 30.7 can lead to delay while this court engages in its own translation efforts, to uncertainty about the meaning of important language, or both.

ny on issue of causation in order to get to a jury).

## B. Negligence of Dr. Borras

■ The Borras Defendants claim that plaintiffs failed to introduce any evidence sufficient to prove either (1) the relevant standards of acceptable medical practice or (2) the causal link between Dr. Borras' conduct and harm to the plaintiffs. While plaintiffs may not have been able to substantiate the broad attack outlined in their complaint, we focus here on only one allegation of negligence: Dr. Borras' failure to provide conservative treatment prior to the first operation.

Defendants argue that plaintiffs failed to prove a general medical standard governing the need for conservative treatment in a case like that of Romero. We disagree. Plaintiffs' chief expert witness, Dr. George Udvarhelyi, testified that, absent an indication of neurological impairment, the standard practice is for a neurosurgeon to postpone lumbar disc surgery while the patient undergoes conservative treatment, with a period of absolute bed rest as the prime ingredient.[7] In these respects, the views of defendants' neurosurgery experts did not diverge from those of Dr. Udvarhelyi. For example, Dr. Luis Guzman Lopez testified that, in the absence of extraordinary factors, "all neurosurgeons go for [conservative treatment] before they finally decide on [an] operation."[8] Indeed, when called by plaintiffs, Dr. Borras (who also testified as a neurosurgery expert) agreed on cross-examination with the statement that "bed rest is normally recommended before surgery is decided in a pa-

tient like Mr. Romero," and claimed that he *did* give conservative treatment to Romero.

■ In spite of Dr. Borras' testimony to the contrary, there was also sufficient evidence for the jury to find that Dr. Borras failed to provide the customary conservative treatment. Dr. Alfonso, Romero's family physician, testified that Dr. Borras, while aware that Romero had not followed a program of absolute bed rest, proceeded with surgery anyway. Although Romero was admitted to the hospital one week before surgery, there was evidence that Dr. Borras neither prescribed nor attempted to enforce a conservative treatment regime. In fact, there was evidence that Dr. Borras' main goal was simply to admit Romero for a week of smoke-free relaxation, not absolute bed rest, because Romero's heavy smoking and mild hypertension made him a high-risk surgery patient. In short, we agree with the district court that the jury could reasonably have concluded that Dr. Borras failed to institute and manage a proper conservative treatment plan.

■ The issue of causation is somewhat more problematic. There are two potential snags in the chain of causation. First, it is uncertain that premature surgery was the cause of Romero's infection. Second, it is uncertain whether conservative treatment would have made surgery unnecessary. With respect to the first problem, the Puerto Rico Supreme Court has suggested that, when a physician negligently exposes a patient to risk-prone surgery, the physician is

---

**7.** Dr. Udvarhelyi testified that "[i]n general, when you have a relatively mild protrusion of the disk [sic] material, our policy is that you provide the patient with the possibility of a conservative treatment." If Dr. Udvarhelyi's reference to "our policy" merely represented a personal view about what he would have done differently, his statement would not be sufficient to establish a general medical standard. *See Rolon–Alvarado,* 1 F.3d at 78. The jury was free, however, to conclude that "our policy" referred to the policy shared by neurosurgeons, particularly where nearly all of defendants' neurosurgery experts espoused the same basic "policy." In addition, Dr. Udvarhelyi later testified, "I couldn't see evidence that a *proper* time was given for the conservative management before deciding surgery." (Emphasis added).

**8.** Defendants argue that, even if Dr. Udvarhelyi's testimony represents the generally accepted standard, that standard does not apply to Romero's case because, according to some of the defense witnesses, Romero *was* suffering from neurological impairments prior to the first surgery. Dr. Guzman, for example, claimed that Romero "had neurological deficit from the very beginning." In contrast, Dr. Udvarhelyi, who claimed that he was fully aware of all of Romero's symptoms, opined that Romero's symptoms at the time did not suggest a neurological deficit. This was a disputed factual issue for the jury to resolve. We cannot say that it would have been unreasonable for the jury to resolve this dispute in plaintiffs' favor.

liable for the harm associated with a foreseeable risk. *See Cruz Rodriguez*, 13 P.R.Sup. Ct.Off'l Translations at 956 ("A treatment that submits the patient to unnecessary and foreseeable risks cannot be considered *reasonable*, when alternate means to reduce or avoid them are available."). In this case, it is undisputed that discitis was a foreseeable risk of lumbar disc surgery.

Turning to the second area of uncertainty, we observe that nearly all of the experts who testified on the subject for both plaintiffs and defendants were of the opinion that conservative treatment would eliminate the need for surgery in the overwhelming majority of cases. Nonetheless, defendants introduced expert testimony that, because Romero suffered from an "extruded" disc, conservative treatment would not have helped. Dr. Udvarhelyi testified, however, that an extruded disc is indeed amenable to conservative treatment. With competent expert testimony in the record, the jury was not left to conjure up its own theories of causation. And certainly, the jury was free to credit some witnesses more than others. The question is admittedly close, but the jury could have reasonably found that Dr. Borras' failure to administer conservative treatment was the "most probable cause" of the first operation.

We conclude that plaintiffs introduced legally sufficient evidence to support each element of at least one major allegation of negligence on the part of Dr. Borras. We therefore hold that the district court properly denied the Borras Defendants' Rule 50 and Rule 59 motions.

## C. Negligence of Asociacion Hospital Del Maestro

 While plaintiffs made a number of allegations against the Hospital, we focus on the allegation that the failure of hospital nurses to report on each nursing shift was a negligent cause of the late detection of Romero's infection.[9]

The Hospital cannot seriously dispute that plaintiffs introduced sufficient evidence on the elements of duty and breach. The Hospital does not contest plaintiffs' allegation that a regulation of the Puerto Rico Department of Health, in force in 1986, requires qualitative nurses' notes for each nursing shift.[10] Nor does the Hospital dispute the charge that, during Romero's hospital stay, the nurses attending to Romero did not supply the required notes for every shift but instead followed the Hospital's official policy of charting by exception. The sole question, then, is whether there was sufficient evidence for the jury to find that violation of the regulation was a proximate cause of harm to Romero.[11]

The Hospital questions plaintiffs' proof of causation in two respects. First, the Hospital claims that plaintiffs did not prove that the charting by exception policy was a proximate cause of the delayed detection of Romero's infection. Second, the Hospital argues that there was no causal relationship between the belated diagnosis of the infection and any unnecessary harm suffered by Romero. We address each of these arguments in turn.

The Hospital essentially argues that it is uncertain whether the hospital staff observed, but failed to record, any material symptoms that would probably have led an attending physician to investigate the possibility of an infection at an earlier stage. The Hospital notes that, even under the charting by exception policy, its nurses regularly recorded such information as the patient's temperature, vital signs, and any medication given to the patient. Indeed, there is some

9. Since we do not reach the issue of the alleged lack of proper hygiene at the hospital, we need not discuss the Hospital's argument that the district court erred in allowing Dr. Udvarhelyi, who qualified only as a neurosurgery expert and allegedly pledged not to testify against the hospital, to testify about the effect of cockroaches in the hospital on the likelihood of infection.

10. The regulation itself was not made part of the record on appeal.

11. The district judge suggested that causation was the principal issue for jury consideration when he instructed the jury that "violation of [a] law or regulation is not in itself enough to constitute negligence absent proof of the existence of the proximate cause between the damage allegedly sustained and such alleged violation of the law and/or of the regulation." Neither party objected to the jury instructions.

evidence that Romero did not have a fever (one possible sign of infection) before May 21, when Dr. Piazza diagnosed the infection and began antibiotic treatment.

Nonetheless, there was evidence from which the jury could have inferred that, as part of the practice of charting by exception, the nurses did not regularly record certain information important to the diagnosis of an infection, such as the changing characteristics of the surgical wound and the patient's complaints of post-operative pain. Indeed, one former nurse at the Hospital who attended to Romero in 1986 testified that, under the charting by exception policy, she would not report a patient's pain if she either did not administer any medicine or simply gave the patient an aspirin-type medication (as opposed to a narcotic). Further, since there was evidence that Romero's hospital records contained some scattered possible signs of infection that, according to Dr. Udvarhelyi, deserved further investigation (e.g., an excessively bloody bandage and local pain at the site of the wound), the jury could have reasonably inferred that intermittent charting failed to provide the sort of continuous danger signals that would be the most likely spur to early intervention by a physician.

■■■ The Hospital claims, however, that, even if faulty record-keeping is a cause of the delayed diagnosis, plaintiffs failed to demonstrate a link between the timing of the diagnosis and the harm Romero eventually suffered. Drawing all inferences in favor of the plaintiffs, it appears that Romero acquired a wound infection as early as May 17 (when a nurse noted a "very bloody" bandage) or May 19 (when Romero complained of pain at the site of the wound); the wound infection then developed into discitis on or about May 20 (when Romero began experiencing excruciating back pain). While there may have

been no way to prevent the initial wound infection, the key question then becomes whether early detection and treatment of the wound infection could have prevented the infection from reaching the disc interspace in the critical period prior to May 20.

Dr. Udvarhelyi testified that "time is an extremely important factor" in handling an infection; a 24 hour delay in treatment can make a difference; and a delay of several days "carries a high-risk [sic] that the infection will [not be] properly controlled." Here, the jury could have reasonably inferred that diagnosis and treatment were delayed at least 24 hours (May 19 to 20), and perhaps 72 (May 17 to 20). As a result, the jury could have reasonably concluded that the timing of the diagnosis and treatment of the wound infection was a proximate cause of Romero's discitis.

In conclusion, we agree with the district judge that this case "is by no means the strongest proposition for medical malpractice against … a hospital," *Romero Lama*, slip op. at 3. Nevertheless, we find none of the Hospital's arguments persuasive enough to disturb the verdict. We hold that plaintiffs met their burden of proof as to the allegation that the Hospital's substandard record-keeping procedures delayed the diagnosis and treatment of Romero's wound infection at a time when controlling the wound infection was likely to prevent the development of the more serious discitis. Accordingly, there was no error in the district court's denial of the Hospital's Rule 50(b) motion for judgment as a matter of law.

*IV.*

### CONCLUSION

There is no need to discuss defendants' other assignments of error.[12] For the fore-

---

12. Appellants' other arguments on appeal are moot, meritless, or waived. First, because the denial of summary judgment is now a non-issue, *see supra* note 5, so is the question whether the district court, in ruling on the motion for summary judgment, failed to adhere to the local rules of the District of Puerto Rico in its treatment of allegedly uncontroverted facts. Second, we discern no reversible error in the district court's denial of the Borras Defendants' "informative motion" concerning the deposition of Dr. Barth

Green, a neurosurgeon who was treating Romero at the time of the trial, and who had planned to operate on Romero in 1992 in an attempt to relieve Romero's persistent back pain. We are puzzled as to how an "informative" motion can be "denied," particularly where leave of court would appear to be unnecessary, *see* Fed.R.Civ.P. 30(a), and no party has moved for a protective order, *see* Fed.R.Civ.P. 26(c). But even if the district court abused its discretion in curtailing

going reasons, the order of the district court denying defendants' motions for judgment as a matter of law and the Borras Defendants' motions for new trial is

*Affirmed.*

discovery of relevant material, the Borras Defen- dants had other means of countering plaintiffs' proof of physical injury, and Romero's condition in 1992 is irrelevant to the compensable harm suffered by plaintiffs *prior* to 1992. In short, the Borras Defendants have not demonstrated the "substantial prejudice" necessary to justify ap- pellate intervention. *Mack v. Great Atl. & Pac. Tea, Inc.*, 871 F.2d 179, 186–87 (1st Cir.1989).

Third, since the Borras Defendants argued the issue of remittitur in the most perfunctory fash- ion on appeal, we deem waived any argument about the excessiveness of the compensatory damages. *See FDIC v. World Univ., Inc.*, 978 F.2d 10, 15 (1st Cir.1992) (noting that "issues adverted to in a perfunctory manner, unaccom- panied by some effort at developed argumenta- tion," may be deemed waived).