UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

 

No. 96-1894

 RAFAELA CORT S-IRIZARRY,

 Plaintiff, Appellant,

 v.

 CORPORACI N INSULAR DE SEGUROS, ET AL.,

 Defendants, Appellees.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Salvador E. Casellas, U.S. District Judge] 

 

 Before

 Torruella, Chief Judge, 

 Coffin, Senior Circuit Judge, 

 and Selya, Circuit Judge. 

 

 David Efron, with whom Kevin G. Little was on brief, for 
appellant.
 Elisa M. Figueroa B ez, with whom Law Offices of Sigrid 
Lopez Gonzalez was on brief, for appellees. 

 

 April 16, 1997
 

 SELYA, Circuit Judge. Plaintiff-appellant Rafaela SELYA, Circuit Judge. 

Cort s-Irizarry (Cort s), suing on behalf of her minor child,

Rafael Jos Mu iz Cort s (Jos ), challenges an order granting

summary judgment to Corporaci n Insular de Seguros (CIS) and its

insured, Juan Ram n Gonz lez Aristud (Dr. Gonz lez), in a medical

malpractice action. See Irizarry v. CIS, 928 F. Supp. 141, 147- 

48 (D.P.R. 1996). We vacate the order and remand for trial.

I. BACKGROUND I. BACKGROUND

 Although the accepted summary judgment protocol calls

for us to cast the facts in the light most complimentary to the

plaintiff's position, consistent with record support, see, e.g., 

Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990), we 

temper that protocol here to the extent that we set off, as point

and counterpoint, conflicting evidence where the clash helps to

illuminate pertinent legal issues. For simplicity's sake we omit

any further reference to CIS and treat its insured as if he were

the sole defendant.

 Dr. Gonz lez, a specialist in obstetrics, provided

prenatal care to Cort s after she became pregnant with Jos . On

December 15, 1979, Cort s related to Dr. Gonz lez that her last

menstrual cycle prior to conception began on November 2 and

lasted only two days. The length of her immediately preceding

menses was three days, and her periods typically had lasted two

or three days during the year prior to her current pregnancy.

Based on this data, Dr. Gonz lez calculated Cort s' estimated

delivery date (EDD) to be August 9, 1980. He delivered Jos by

 2

cesarean section on July 30, 1980. The newborn weighed eight

pounds, eight and three-quarter ounces (two pounds more than

Cort s' first child) and exhibited no fetal distress.

 According to the defendant's computations, Cort s was

in her thirty-ninth week of pregnancy when the baby arrived.

This calculation forms the nub of the case. The plaintiff's

theory is that Dr. Gonz lez misfigured the baby's fetal age and,

consequently, allowed the pregnancy to continue beyond forty-two

weeks, thus bringing into play a risk factor known as "post-

datism" or "post-maturity." A post-dated fetus is at risk of

oxygen deprivation during its extended stay in the mother's womb,

and brain damage is a predictable result. While Jos , at birth,

displayed no detectable symptoms suggesting a post-dated

delivery, the circumstances of the delivery revealed some

indications of potential perinatal difficulties; for instance,

the cesarean section took twenty-one minutes (roughly twice as

long as the norm), and, on one view of the proof, a tracheal

catheter was used to intubate the newborn.1

 Time resolved these mixed signals. Jos showed signs

of neurologic abnormality at three months and was diagnosed with

  

 1Other contemporaneous indicators were inscrutable. On the
one hand, Jos had a relatively high Apgar score. An Apgar score
is comprised of five components: heart rate, respiratory effort,
muscle tone, reflex irritability, and color. It usually is
compiled by the anesthesiologist at one minute after the delivery
and again at the five-minute mark. A low score is generally
thought to have predictive value in determining brain damage. On
the other hand, testing at birth revealed a somewhat elevated
serum bilirubin level (which could indicate an incipient
metabolic problem).

 3

impaired motor development and hearing loss at fourteen months.

His condition worsened as the years passed. As an adolescent, he

was diagnosed as severely brain damaged, epileptic, and

profoundly deaf. At that juncture, Cort s, then a citizen of

Florida, sued Dr. Gonz lez in Puerto Rico's federal district

court, see 28 U.S.C. 1332(a) (diversity jurisdiction), alleging 

that the physician's negligence caused her son's infirmities.

 Cort s' case rests primarily on the opinions of two

experts. An obstetrician, Dr. Bernard Nathanson, opined that a

competent obstetrician, rather than relying upon a reported two-

day menstrual period to calculate a gravid woman's EDD, would

have launched a more detailed gynecologic investigation. Had Dr.

Gonz lez done so, the witness stated, he would have discovered

that Cort s' actual EDD was July 9, 1980, and he would have

recognized that a substantial risk of post-datism arose when her

pregnancy extended past the EDD (a risk which he presumably could

have negated by performing the cesarean section earlier). In

reaching these conclusions, Dr. Nathanson stressed the unusual

brevity of the reported period (especially as contrasted with

Cort s' previous menses) and Dr. Gonz lez' failure to confirm the

EDD by performing various tests which the witness stated were

available in 1979-1980 (e.g., a B-scan ultrasound examination).

In Dr. Nathanson's opinion, the pregnancy was post-dated, and the

defendant's failure to realize it and take corrective action

violated the prevailing standard of care.

 Dr. Nathanson also disputed Dr. Gonz lez' assertion

 4

that he in fact performed a manual pelvic examination at Cort s'

initial appointment and subsequently measured her uterus

throughout her pregnancy to corroborate the EDD. Dr. Nathanson

saw no evidence that these steps had been taken. Moreover, Dr.

Gonz lez' office record did not mention either the periodic

uterine measurements or their results. Although some of Cort s'

prenatal charts apparently had been lost, Dr. Nathanson stated

that these data "are so vital that they should be in [Dr.

Gonz lez'] record in any case had he done them."

 The plaintiff's second expert, Dr. Allan Hausknecht, a

neurologist, diagnosed Jos as suffering from Lennox Gasteault

Syndrome (LGS). This neurological condition is caused roughly

fifty percent of the time by perinatal brain damage (resulting

from a lack of sufficient oxygen to the fetal brain). Doctor

Hausknecht stated that, in his experience, this percentage

increases sharply when, as in this instance, no evidence of any

other known cause exists. Noting that the gradual development of

Jos 's condition was characteristic of a post-mature fetus, Dr.

Hausknecht rendered an opinion that Jos 's brain damage resulted

from the post-datism which Dr. Nathanson had identified. This

opinion was bolstered in some degree by Dr. Nathanson's statement

that, while some post-dated infants will show immediate signs of

placental senescence, such as meconium-stained amniotic fluid or

peeling of the skin (Jos had neither), many others will appear

asymptomatic at birth yet manifest the effects of post-datism at

a later time.

 5

 To be sure, the plaintiff's evidence was hotly

contested. The defendant claimed that he had figured the EDD

accurately and that many of the tests suggested by Dr. Nathanson

were unnecessary, or impracticable, or both. He also presented

experts who offered an alternative theory of causation:

intrauterine cytomegalovirus (CMV) infection, a rare condition

which occurs in 0.2 to 2.2 percent of all live births. The

results of blood tests performed on Jos at age fifteen revealed

previous or latent CMV infection, but did not indicate whether

the infection had been contracted in utero. This is a

significant omission because, while infants who suffer from CMV

may be asymptomatic at birth and thereafter develop mental

retardation or deafness, CMV can be transmitted in various ways

and affects most individuals during their lifetimes.

II. THE SUMMARY JUDGMENT STANDARD II. THE SUMMARY JUDGMENT STANDARD

 A court may grant summary judgment "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). We have expounded this standard and its particulars in a

symphony of cases, see, e.g., McCarthy v. Northwest Airlines, 

Inc., 56 F.3d 313, 315 (1st Cir. 1995) (collecting cases), and we 

refrain from rehearsing this jurisprudential chorus here. For

our purposes, it suffices briefly to describe the rule's

operation.

 6

 The objective of summary judgment "is to pierce the

boilerplate of the pleadings and assay the parties' proof in

order to determine whether trial is actually required." Wynne v. 

Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992). To 

defeat a motion for summary judgment, the nonmoving party must

demonstrate the existence of a trialworthy issue as to some

material fact. See Coyne v. Taber Partners I, 53 F.3d 454, 457 

(1st Cir. 1995). A fact is "material" if it potentially could

affect the suit's outcome. See Garside, 895 F.2d at 48. An 

issue concerning such a fact is "genuine" if a reasonable

factfinder, examining the evidence and drawing all reasonable

inferences helpful to the party resisting summary judgment, could

resolve the dispute in that party's favor. See National 

Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.), 

cert. denied, 115 S. Ct. 2247 (1995). 

 Exercising de novo review, see Coyne, 53 F.3d at 457, 

we hold that the record in this case presents triable issues as

to whether Dr. Gonz lez violated his duty of care, and, if so,

whether his actions caused Jos 's injuries. Consequently, the

district court erred in granting the motion for brevis 

disposition.

III. ANALYSIS III. ANALYSIS

 We first survey the junction where summary judgment

principles and the standards governing the admissibility of

expert scientific evidence intersect. We then evaluate the lower

court's ruling.

 7

 A. A. 

 The defendant asserts on appeal that the entry of

judgment should be affirmed because the district court had the

power to exclude the plaintiff's expert evidence pursuant to

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 

(1993), and that, without such evidence, the plaintiff has no

case. Cort s parries this thrust by contending that Daubert does 

not apply at the summary judgment stage. The truth lies

somewhere in between.

 The Daubert Court formulated a regime for use in 

ascertaining the admissibility of expert scientific evidence

under Fed. R. Evid. 702.2 This regime contemplates that trial

judges will perform a gatekeeping function, determining "whether

the reasoning or methodology underlying [proffered expert]

testimony is scientifically valid and . . . whether that

reasoning or methodology properly can be applied to the facts in

issue." Daubert, 509 U.S. at 592-93; see United States v. 

Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993) (discussing this 

function).

  

 2The rule stipulates:

 If scientific, technical, or other
 specialized knowledge will assist the trier
 of fact to understand the evidence or to
 determine a fact in issue, a witness
 qualified as an expert by knowledge, skill,
 experience, training, or eduction, may
 testify thereto in the form of an opinion or
 otherwise.

Fed. R. Evid. 702.

 8

 The plaintiff posits that Daubert is strictly a time- 

of-trial phenomenon. She is wrong. The Daubert regime can play 

a role during the summary judgment phase of civil litigation. If

proffered expert testimony fails to cross Daubert's threshold for 

admissibility, a district court may exclude that evidence from

consideration when passing upon a motion for summary judgment.

See Cavallo v. Star Enter., 100 F.3d 1150, 1159 (4th Cir. 1996), 

petition for cert. filed, 65 U.S.L.W. 2399 (U.S. Mar. 19, 1997) 

(No. 96-1493); Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 

297-99 (8th Cir. 1996), petition for cert. filed, 65 U.S.L.W. 

3539 (U.S. Jan. 29, 1997) (No. 96-1212); Claar v. Burlington 

N.R.R., 29 F.3d 499, 502-05 (9th Cir. 1994); Porter v. Whitehall 

Lab., Inc., 9 F.3d 607, 612, 616-17 (7th Cir. 1993). 

 The fact that Daubert can be used in connection with 

summary judgment motions does not mean that it should be used

profligately. A trial setting normally will provide the best

operating environment for the triage which Daubert demands. Voir 

dire is an extremely helpful device in evaluating proffered 

expert testimony, see Sepulveda, 15 F.3d at 1184 n.15, and this 

device is not readily available in the course of summary judgment

proceedings. Moreover, given the complex factual inquiry

required by Daubert, courts will be hard-pressed in all but the 

most clearcut cases to gauge the reliability of expert proof on a

truncated record. Because the summary judgment process does not

conform well to the discipline that Daubert imposes, the Daubert 

regime should be employed only with great care and circumspection

 9

at the summary judgment stage.

 We conclude, therefore, that at the junction where

Daubert intersects with summary judgment practice, Daubert is 

accessible, but courts must be cautious except when defects are

obvious on the face of a proffer not to exclude debatable

scientific evidence without affording the proponent of the

evidence adequate opportunity to defend its admissibility.3 See 

Margaret A. Berger, Procedural Paradigms for Applying the Daubert 

Test, 78 Minn. L. Rev. 1345, 1379-80, 1381 (1994). 

 Having rejected the plaintiff's broadcast contention

that Daubert can never be used at the summary judgment stage, we 

turn to the defendant's case-specific argument that Daubert 

necessitates the exclusion of the opinions advanced by the

plaintiff's experts. This asseveration suffers from a very basic

shortcoming: the defendant never asked the district court to

exclude this evidence from consideration, and the district court

made no effort to do so on its own initiative. If trial courts

should be slow to employ Daubert at the summary judgment stage, 

appellate courts should be even more hesitant to head in that
  

 3Though such an opportunity is most easily afforded at trial
or in a trial-like setting, courts have displayed considerable
ingenuity in devising ways in which an adequate record can be
developed so as to permit Daubert rulings to be made in 
conjunction with motions for summary judgment. See, e.g., Brown 
v. SEPTA (In re Paoli R.R. Yard PCB Litig.), 35 F.3d 717, 736, 
739 (3d Cir. 1994) (discussing use of in limine hearings), cert. 
denied, 115 S. Ct. 1253 (1995); Claar, 29 F.3d at 502 (discussing 
district court's technique of ordering experts to submit serial
affidavits explaining the reasoning and methodology underlying
their conclusions). We do not in any way disparage such
practices; we merely warn that the game sometimes will not be
worth the candle.

 10

direction where there has been no development of the issue below.

After all, the bifurcated inquiry into reliability and relevance

which Daubert requires is best performed by trial judges who, 

unlike appellate judges, have a broad array of tools which can be

brought to bear on the evaluation of expert testimony.4 Hence,

we can envision few, if any, cases in which an appellate court

would venture to superimpose a Daubert ruling on a cold, poorly 

developed record when neither the parties nor the nisi prius

court has had a meaningful opportunity to mull the question.

 This case falls squarely into the maw of these general

principles. The defendant, notwithstanding the animadversions

that he spouts on appeal, never asked in the district court to

strike or otherwise defenestrate the statements of Drs. Nathanson

and/or Hausknecht. The district court's rescript neither cites

Daubert nor purposes to exclude the expert evidence submitted on 

the plaintiff's behalf. And, moreover, the record as it stands

is wholly inadequate to permit a reasoned Daubert determination. 

For these reasons, we decline the defendant's odd invitation that

we start from scratch and undertake a Daubert analysis in the 

  

 4It is for this reason, coupled with the special coign of
vantage which trial courts enjoy, that we have afforded district
judges broad discretion in determining whether particular
scientific testimony is or is not admissible at trial. See Hoult 
v. Hoult, 57 F.3d 1, 5 (1st Cir. 1995); Sepulveda, 15 F.3d at 
1183. In this vein, we note that the Supreme Court soon will
resolve a disagreement among the circuits as to the appropriate
standard for reviewing such decisions. See Joiner v. General 
Elec. Co., 78 F.3d 524 (11th Cir. 1996), cert. granted, 65 
U.S.L.W. 3619 (U.S. Mar. 17, 1997) (No. 96-188). That standard-
of-review question need not concern us today.

 11

context of this appeal.5 This means, of course, that we must

consider the entire record, including the opinions of Drs.

Nathanson and Hausknecht, as we ponder the merits of the district

court's dispositive ruling.

 B. B. 

 In this diversity suit, the substantive law of Puerto

Rico controls. See Erie R.R. v. Tompkins, 304 U.S. 64, 78 

(1938); Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 

(1st Cir. 1993). The Puerto Rico Civil Code states that "[a]

person who by an act or omission causes damage to another through

fault or negligence shall be obliged to repair the damage so

done." P.R. Laws Ann. tit. 31, 5141 (1991). Under this

proviso, three elements comprise a prima facie case of medical

malpractice; a plaintiff must establish (1) the duty owed (i.e.,

the minimum standard of professional knowledge and skill required

in the relevant circumstances), (2) an act or omission

transgressing that duty, and (3) a sufficient causal nexus
  

 5In all events, we note that the two grounds urged by the
defendant in support of his exclusionary request are
inappropriate. First, Dr. Gonz lez asserts that his expert
evidence is more persuasive than the plaintiff's. His insistence
that this circumstance warrants exclusion of the competing expert
evidence contradicts fundamental principles of summary judgment
practice. See, e.g., Greenburg v. Puerto Rico Maritime Shipping 
Auth., 835 F.2d 932, 936 (1st Cir. 1987). Daubert does not 
reverse these principles. See Daubert, 509 U.S. at 595-96; see 
also Ambrosini v. Labarraque, 101 F.3d 129, 140-41 (D.C. Cir. 
1996), petition for cert. filed, U.S.L.W. (U.S. Apr. 1, 
1997) (No. 96-1552). Second, he claims that the testimony of the
plaintiff's witnesses, if allowed, would be confusing. The fact
that particular expert evidence might tend to confuse or mislead
a jury can constitute grounds for exclusion of the evidence at
trial, see Fed. R. Evid. 403, but it is not directly relevant to 
a Daubert analysis. See Daubert, 509 U.S. at 595-96. 

 12

between the breach and the claimed harm. See Lama v. Borras, 16 

F.3d 473, 478 (1st Cir. 1994); Rolon-Alvarado, 1 F.3d at 77. On 

whole-record review, we conclude that the plaintiff produced

sufficient evidence to establish a genuine factual controversy as

to each element.

 1. Duty and Breach. In this case, the elements of 1. Duty and Breach. 

duty and breach are inextricably intertwined. Thus, we address

them in the ensemble.

 Puerto Rico holds health care professionals to a

national standard of care. See Oliveros v. Abreu, 101 P.R. Dec. 

209, 226-27, translated in 1 P.R. Sup. Ct. Off'l Trans. 293, 313 

(1973). Accordingly, a health care provider has "a duty to use

the same degree of expertise as could reasonably be expected of a

typically competent practitioner in the identical specialty under

the same or similar circumstances, regardless of regional

variations in professional acumen or level of care." Rolon- 

Alvarado, 1 F.3d at 77-78. Nevertheless, because Puerto Rico law 

presumes that physicians exercise reasonable care, a plaintiff

bent on establishing a breach of a physician's duty of care

ordinarily must adduce expert testimony to limn the minimum

acceptable standard and confirm the defendant doctor's failure to

meet it. See id. at 78. 

 Cort s' proffer is sufficient to this end. Dr.

Nathanson, a specialist in the same field as Dr. Gonz lez,

clearly delineated the standard of care and identified what he

believed to be Dr. Gonz lez' departures from it. He stated

 13

categorically that an "average gynecologist" would not rely on a

reported two-day menstrual period unusually short even if

relatively common to that particular individual and that the

failure to perform corroborating tests then available violated

"the prevailing medical standard." For purposes of summary

judgment, affiants and witnesses need not be precise to the point

of pedantry. Thus, we treat Dr. Nathanson's references to the

"average gynecologist" and to "the prevailing medical standard"

as meaning the national standard of care. Cf. Lama, 16 F.3d at 

479 n.7.

 The district court advanced three principal grounds in

support of its conclusion that these issues duty and breach 

could be resolved against the plaintiff at the summary judgment

stage, notwithstanding Dr. Nathanson's opinion evidence. All of

these grounds lack persuasive force.

 First, the court observed that Cort s' menstrual

periods had lasted "an average of two to three days," and,

accordingly, "a two-day period was not abnormal or unusually

short for her." Irizarry, 928 F. Supp. at 146. But Dr. 

Nathanson's testimony supported the opposite conclusion; thus,

whether the menses was abnormal and whether it triggered a duty

to inquire further became questions of fact not properly resolved

on summary judgment. See, e.g., Greenburg v. Puerto Rico 

Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). 

 Second, the court determined that, because Dr. Gonz lez

measured the uterus periodically throughout the pregnancy,

 14

yielding results consistent with the EDD on which he relied, he

had no reason to suspect an earlier date of conception or to

order any additional tests. See Irizarry, 928 F. Supp. at 146. 

While Dr. Gonz lez so testified, the court erred in treating that

testimony as conclusive. When Dr. Gonz lez' and Dr. Nathanson's

assertions are juxtaposed, the net result is a factual issue as

to whether the defendant made the measurements, and, if so,

whether this procedure satisfied the applicable standard of care.

 Third, the court damned Dr. Nathanson's opinion with

the faintest of praise, characterizing it as nothing more than

one doctor's assertion that he would have acted differently in

identical circumstances than did another, and, consequently,

denying it effect in the summary judgment calculus. See id. at 

147. We accept the court's premise that a mere disagreement in

medical judgment, without more, does not prove duty or breach in

a medical malpractice case brought under Puerto Rico law. See 

Rolon-Alvarado, 1 F.3d at 78. But we reject the court's 

conclusion; Dr. Nathanson's declarations, read in context, amount

to a satisfactory statement of the standard of care and the

defendant's deviation from it which, if credited by a jury, could

support a finding for the plaintiff on these elements of her

cause of action. And in the absence of a Daubert determination 

excluding the Nathanson evidence as scientifically untenable, the

trial court was not at liberty on summary judgment to ignore that

evidence merely because it deemed other evidence more credible.

 2. Causation. Notwithstanding proof of both duty and 2. Causation. 

 15

breach, a plaintiff also must offer competent evidence of

causation in a medical malpractice case. See Rolon-Alvarado, 1 

F.3d at 77. The lower court found the plaintiff's submissions on

this element wanting. See Irizarry, 928 F. Supp. at 147. We 

demur.

 A medical malpractice plaintiff can and often does 

establish causation through expert testimony. See Lama, 16 F.3d 

at 478. Cort s took that route. Dr. Nathanson offered an

opinion to a reasonable degree of medical certainty that Cort s'

EDD was actually July 9, not August 9, and that this one-month

discrepancy had dire consequences. If accepted, this testimony

meant that Dr. Gonz lez did not perform the cesarean section

until the forty-third week of a post-dated pregnancy.

 Relatedly, Dr. Hausknecht diagnosed Jos as suffering

from LGS, which, in the absence of any genetic or other known

explanation, is generally thought to be caused by perinatal brain

damage. It is undisputed that the adverse effects of post-datism

include oxygen deprivation, and thus can lead to brain damage.

Finding no evidence of any hereditary etiology and observing a

pathology consistent with post-datism, Dr. Hausknecht opined that

Jos 's cerebral damage probably was caused by the post-datism

which Dr. Nathanson identified. Both physicians also noted

likely indications of complications at birth, and these findings

buttress the plaintiff's theory of causation.6 Drawing
  

 6Dr. Nathanson dwelled on the unusual duration of the
cesarean section and the apparent use of a tracheal catheter to
resuscitate the infant at birth. Dr. Hausknecht noted that there

 16

reasonable inferences from this evidence, a rational jury could

find that Dr. Gonz lez' negligent reliance upon a reported two-

day menstrual period and his eschewal of further (available)

tests caused a post-dated pregnancy, the effects of which

included perinatal brain damage which manifested itself in the

form of LGS.

 Of course, the defendant's experts debunked the

plaintiff's proof and offered an alternative causal theory the

presence of a CMV infection which the district court found

"more compelling." Irizarry, 928 F. Supp. at 147. But such 

comparisons are invidious at the summary judgment stage. Even at

trial, a plaintiff in a medical malpractice suit need not prove a

causal connection with mathematical accuracy nor eliminate all

other possible causes of damage. See Cruz Rodriguez v. 

Corporaci n de Servicios del Centro M dico, 113 P.R. Dec. 719, 

744, translated in 13 P.R. Sup. Ct. Off'l Trans. 931, 960-61 

(1983). Legal rules of this sort acquire added significance on

summary judgment because Rule 56 "contemplates an abecedarian,

almost one dimensional, exercise geared to determining whether

the nonmovant's most favorable evidence and the most flattering

inferences which can reasonably be drawn therefrom are sufficient

to create any authentic question of material fact." Greenburg, 

835 F.2d at 936.

 In this case, the defendant's evidence on the issue of
  

had been an abnormal bilirubin level at birth and expressed a
belief that this might evince a metabolic problem damaging the
brain.

 17

causation, as compelling as it might have seemed, did not warrant

the entry of summary judgment. The plaintiff articulated an

alternative theory of causation and backed it up with expert

testimony as to the causal nexuses between LGS and perinatal

damage, and between perinatal damage and post-datism. At the

same time, she cast doubt on the defendant's theory of causation,

establishing the low incidence of intrauterine CMV infection and

suggesting an alternate origin of any CMV detected in Jos 's

system (related to a history of sexual molestation at school,

thereby opening up the possibility that any CMV infection was

sexually transmitted). This evidence sufficed to create a

trialworthy issue vis- -vis the element of causation. See Coyne, 

53 F.3d at 460 (explaining that "when the facts support plausible

but conflicting inferences on a pivotal issue in the case, the

judge may not choose between those inferences at the summary

judgment stage"); see also United States v. Kayne, 90 F.3d 7, 12 

(1st Cir. 1996) (stating that disagreements among experts are

"properly the subject of searching cross-examination" at trial),

cert. denied, 117 S. Ct. 681 (1997). 

III. CONCLUSION III. CONCLUSION

 We need go no further. Scrutinizing the entire record

in the light most congenial to the plaintiff, rational jurors

could find all the elements of medical malpractice. Though the

plaintiff's evidence may appear thin to some, it establishes

factual disagreements as to which reasonable minds may differ.

No more is exigible. See Greenburg, 835 F.2d at 936 (explaining 

 18

that the ground rules associated with summary judgment practice

"admit of no room for credibility determinations, no room for the

measured weighing of conflicting evidence such as the trial

process entails, no room for the judge to superimpose his own

ideas of probability and likelihood (no matter how reasonable

those ideas may be) upon the carapace of the cold record").

Right or wrong, the plaintiff is entitled to present her case to

a jury.

 The order granting summary judgment is vacated and the The order granting summary judgment is vacated and the 

case is remanded for trial. Costs to appellant. case is remanded for trial. Costs to appellant. 

 19