**Rafaela Cortes IRIZARRY,
et al., Plaintiffs,**

v.

**CORPORACION INSULAR
DE SEGUROS, et al.,
Defendants.**

**Civil No. 92–1848(SEC).**

United States District Court,
D. Puerto Rico.

June 11, 1996.

David Efrón, Río Piedras, PR, for Plaintiffs.

Sigrid López–González, San Juan, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

In the instant case, plaintiff Rafael José Muñiz Cortés, a minor herein represented by his mother, is suing Dr. Juan González Aristud and his insurer, averring that Dr. González should be held responsible for his brain damage, impaired development, deafness, and other physical disabilities. The complaint was filed twelve years after plaintiff's birth.[1] In it, plaintiff argues that these dam-

---

1. Under Puerto Rico law, the statute of limitations for a tort action brought by a minor plaintiff is tolled until the plaintiff becomes twenty-one years old. The practical consequence of this statutory provision is that medical malpractice claims like this one can be brought up to twenty-one years after birth, when all records and witnesses may already be unavailable. In our opin-

ages are the consequence of defendant Dr. Gonzalez's alleged failure to accurately assess the last menstrual period plaintiff's mother had before becoming pregnant with him. Plaintiff further charges that defendant's negligence and the inadequate care given to plaintiff's mother during her pregnancy, caused plaintiff to be born "postdated," that is, after the forty-third gestational week. According to plaintiff, this postdatism is the reason for his subsequent medical problems.

Currently before the Court is defendant's Motion to Dismiss and/or Summary Judgment [2] (Docket No. 57), by the Puerto Rico Insurance Guaranty Association on behalf of defendant Dr. Juan González Aristud. Defendants argue that Dr. González Aristud provided to plaintiff's mother a reasonable degree of care and that he followed the best practices in obstetrics at the time. Defendants assert that since Dr. González had cared for Ms. Cortés for several years and had even successfully delivered her first child, he was thoroughly familiar with her medical history, including the average length of her menstrual periods. Therefore, he was justified in taking her self-reported two-day menstrual period as her last prior to conception, and calculate her due date based on it. Defendants further assert that Dr. González confirmed the fetal age by performing a pelvic exam. They point out that Ms. Cortés' cesarean section, like the pregnancy itself, was normal, and that the baby was born with no complications or apparent ailments. Based on these facts, as well as on the results of a battery of tests performed on plaintiff during the pendency of this case, defendants conclude that plaintiff was not born postdated.

Plaintiff opposes defendants' dispositive motion, asserting that his expert witnesses back up his theory of the case and that the disagreement between his experts and defendants' as to the cause of plaintiff's physical problems precludes entry of summary judgment. See Docket No. 66. Defendants riposte, arguing that plaintiff has failed to present sufficient evidence to defeat the summary judgment motion, and that the experts' divergent views do not involve issues of material fact. See Docket No. 70.[3]

After close perscrutation of the record and the pertinent statutory and case law, the Court hereby GRANTS defendants' motion for summary judgment, for the reasons explained below.

**I**

**Summary Judgment Standard**

Any discussion of the issues in this case must be framed within the confines of the summary judgment standard. As noted by the First Circuit, summary judgment has a special niche in civil litigation. Its role is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources. *McCarthy v. Northwest Airlines, Inc.* 56 F.3d 313, 315 (1st Cir.1995).

According to Fed.R.Civ.P. 56(c), a summary judgment motion should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file,

ion, this situation poses serious due process concerns given the inordinate length of time that may have elapsed between the commission of the alleged negligent act or omission and the filing of the complaint. Defendants may be put in the untenable position of having to defend themselves against charges based on long-forgotten events and supported by missing or incomplete records. Our concerns regarding defendants' due process rights in these cases are exacerbated when the minor plaintiffs have responsible par-

ents or tutors who would have been more than capable of presenting plaintiff's claim in a more timely and reasonable fashion which would be less onerous on defendants.

2. Counsel are instructed to refer to the Court's Standing Order on dispositive motions, in order to avoid future misnomers.

3. Plaintiff chose not to respond to defendants' surreply.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28 (1st Cir. 1994). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

For a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the nonmoving party. *U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992). See also *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994). Counsel's factual assertions and self-serving argumentation are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment by relying upon mere allegations or evidence that is less than significantly probative. See *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994).

Moreover, this Court may not weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.* (citing *Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

## II

### Medical Malpractice Standard

The substantive law of Puerto Rico controls this suit brought under the aegis of the Court's diversity jurisdiction. Article 1802 of the Civil Code of Puerto Rico provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage done." 31 LPRA 5141. In order to successfully establish a prima facie case of medical malpractice in Puerto Rico, a plaintiff must meet three requirements [4]:

1. *Applicable National Standard of Care.* Plaintiff must demonstrate the basic norms of knowledge and the standard of medical care applicable to general practitioners or specialists. This requirement imposes on the plaintiff a more onerous burden in a medical malpractice case than in an ordinary tort case, since the physician's duty is dependent upon the applicable national standard of care. *Rolón v. San Juan*, 1 F.3d 74, 77 (1st Cir.1993). According to the Supreme Court of Puerto Rico, doctors are required to provide "[t]hat [level of care] which, recognizing the modern means of communication and education, . . . meets the professional requirements generally acknowledged by the medical profession." *Oliveros v. Abreu*, 101 DPR 209, 226 (1973). *Oliveros* marks the departure from the 'community standard' rule which had been adopted in *Rivera v. Dunscombe*, 73 DPR 819 (1952), to a "more universal, less parochial approach to establishing the standard of acceptable care for purposes of a medical malpractice suit." *Rolón*, 1 F.3d at 77. See also *Valedón v. Hospital Presbiteriano*, 806 F.2d 1128, 1135–36 (1st Cir. 1986) (discussion of the *Oliveros* decision).

2. *Defendants' Failure to Comply with This Standard.* Plaintiff must offer adequate proof to establish that the medical personnel failed to follow the standard of care in the treatment of the patient. Under Puerto Rico law, "there exists always a presumption that the treating physicians have

---

**4.** These elements have been reviewed and approved once more by the First Circuit in the recent case of *Fernández v. Corp. Insular De Seguros*, 79 F.3d 207, 210 (1996).

observed a reasonable degree of care ... in the process of giving medical attention and treatment." *Rolón*, 1 F.3d at 77 (citing *Del Valle v. US*, 630 F.Supp. 750, 756 (D.P.R.1986)). Plaintiff bears the heavy burden of refuting this presumption. As stated by the Court of Appeals for the First Circuit in *Rolón*, "[m]edicine ... is not an exact science. It is, therefore, insufficient for a plaintiff in a malpractice case merely to show that another doctor would have chosen to treat the patient in a manner different from the manner in which the attending physicians treated him." 1 F.3d at 77. Plaintiff's evidence must be sufficient to show that "the alleged fault and damage is more than a mere hindsight possibility." 630 F.Supp. at 756. Furthermore, plaintiff must demonstrate, by preponderance of the evidence, that the negligence of the treating physicians is the main probable cause of plaintiff's damages. *Vda. de López v. ELA*, 104 DPR 178, 183 (1975). See *also Reyes v. Phoenix Assurance Co.*, 100 DPR 871, 876 (1971).

3. *Causality*. A causal relationship must link the medical staff's act or omission to the patient's injury. This causal nexus "cannot be established based on speculation or conjecture, only by preponderance of the evidence, as in every other civil case." *Vda. de López*, 104 DPR at 183. (Translation ours.)

For a plaintiff to prevail in a medical malpractice suit, he has to prove all three of the abovementioned elements.

### III

### Discussion

In analyzing the issues in this case, we must bear in mind that "tort law neither holds a doctor to a standard of perfection nor makes him an insurer of his patient's wellbeing. Professional standards require normative judgments, not merely proof that a better way to treat a particular patient could have been devised." *Rolón*, 1 F.3d at 77. See also *Medina v. Vélez*, 120 DPR 380, 385 (1988). This case turns upon one such normative judgment: whether Dr. González erred in relying on his patient's own report of her last menstrual period and on the corroborating pelvic examination to calculate Ms. Cortés' due date.

A close examination of plaintiff's voluminous filings shows that the only issue on which he bases his malpractice claim is Dr. Gonzalez's alleged miscalculation of his mother's due date. This allegation is then used as the foundation upon which plaintiff anchors his entire case. Plaintiff alleges that:

1. Dr. González should have known that a two-day menstrual period could not have been a 'regular period.'

2. Since Ms. Cortés' self-reported last period was abnormal, Dr. González should have taken her previous month's menstrual period as the proper menarche from which to calculate her due date.

3. Dr. González was negligent in performing only a pelvic exam to confirm the stage of his patient's pregnancy as derived from her last reported menstrual period.

4. Plaintiff was born after the forty-third week of pregnancy.

5. His apparently healthy condition at birth hid the fact that he was postdated.

6. Plaintiff's postdatism became noticeable when he was around a year old, at which time he was diagnosed as developmentally delayed and hearing impaired.

Based on these allegations, plaintiff attempts to link Dr. González with his very serious medical problems. As support for his allegations, plaintiff presents two expert witnesses: Dr. Bernard N. Nathanson and Dr. Allan Hausknecht. These experts play a key role in this litigation, "[b]ecause [since] medical knowledge and training are critical to demonstrating the parameters of a health-care provider's duty, the minimum standard of acceptable care is almost always a matter of informed opinion. Thus it must ordinarily be established by expert testimony." *Rolón*, 1 F.3d at 77. For this reason, we now turn to the reports and depositions of plaintiff's expert witnesses.

### *Dr. Nathanson's opinion*

Dr. Nathanson, an ob/gyn, in both his report and his deposition, catalogues Dr. González's actions in treating Ms. Cortés as neg-

ligent and against the appropriate standard of care. He bases his opinion on the following findings:

1. *The abnormality of a two-day menstrual period.* Dr. Nathanson questions Dr. González's judgment in using a two-day menarche as the last period prior to conception. In this regard, Dr. Nathanson states that "[i]t is critical to state that this menstrual period was only two days long and her normal menstrual periods lasted three days." Thus, Dr. Nathanson concludes that Ms. Cortés' due date was miscalculat- . ed, and that she was actually forty-three weeks pregnant at the time of her delivery by c-section. However, according to Ms. Cortés' record, which dates back to a previous pregnancy three years earlier, over the last year prior to her second pregnancy Ms. Cortes' menstrual periods had lasted an average of two to three days. Therefore, a two-day period was not abnormal or unusually short for her, given her gynecological history.[5]

2. *Postdatism.* Dr. Nathanson's conclusion that Ms. Cortés was in her forty-third week of pregnancy leads him to conclude as well that her pregnancy was postdated, and as such, constituted a high-risk pregnancy. Dr. Nathanson also states that "[t]he standard of care in 1980 mandated that ... antepartum testing be initiated after the end of the 42nd week of pregnancy, and in failing to do so the physician here violated the applicable standard of care." In his deposition, Dr. Nathanson adds that he reviewed no evidence that Dr. González had ever performed any of the five tests to determine fetal age, including a pelvic examination at the beginning of

the pregnancy and measurement of the uterus in each of the subsequent prenatal visits. However, in his deposition, Dr. González states that he confirmed Ms. Cortés' pregnancy and her estimated due date through a pelvic examination on her first prenatal visit, as well as through manual measurements of her uterus at each of her subsequent ten appointments. The results of those examinations were consistent with Dr. González's calculations.[6] Thus, Dr. González had no reason to suspect that his calculations could be wrong, and therefore, no reason to order any tests usually done on women whose pregnancies are postdated.[7]

3. *Intubation.* Dr. Nathanson insists that the fact that plaintiff was intubated at birth is indicative that he was born in distress; otherwise, he would not have needed to be resuscitated. However, there is no indication in the record that plaintiff was intubated; Dr. Nathanson bases his conclusion on the fact that the words "tracheal catheter" are circled in the hospital sheet detailing Ms. Cortés' delivery. However, the Court has examined the document in question, and cannot agree that those half-circled words, taken in the context of the available record as a whole, mean that plaintiff was intubated, especially given that everything else in that same form is marked with a check mark. There is no way to tell if that circle was made by someone who was reviewing the form at a later date. Indeed, the record shows that plaintiff's birth was normal and that he showed no indications of fetal distress, postdatism, or any other ailment.[8]

---

5. It is pertinent to note that at the time of plaintiff's birth, his mother had been Dr. González's patient for over three years. Her last appointment with him was five years after plaintiff's birth.

6. The record corresponding to Ms. Cortés' prenatal visits has been lost. The only record remaining is the office record Dr. González kept. According to him, it was his usual practice at the time to give his pregnant patients their prenatal records to take to the hospital, while he retained no copies.

7. Dr. Nathanson himself admits in his deposition that "if Dr. González went through all those

modalities and they were all consistent with the menstrual period of 2 November 1979, of course I would then say it is not post-datism ..." Nathanson's deposition at pp. 40–41.

8. At birth, plaintiff weighed over eight pounds, and had an Apsgar score of eight after one minute and nine after five minutes, which indicates that plaintiff's prognosis at birth was excellent. His appearance and demeanor as a newborn were observed and noted on the hospital records, which show that plaintiff was an active baby, who fed well, and appeared content. None of the symptoms associated with postdatism were present at delivery, to wit: meconium-stained

4. *Nexus.* Dr. Nathanson refrains from giving any opinion regarding the connection between his finding of postdatism and plaintiff's damages. In fact, he says, "in the matter of proximate cause regarding the post-datism and its nexus to the ultimate damages, here I shall defer to the neurologist." In his deposition he also states that since he is not a pediatrician, he could not offer any opinion as to plaintiff's condition at the time of birth, beyond a mere recounting of the facts he derived from the record.

Based on these four main issues, Dr. Nathanson's opinion is insufficient to prove any of the requirements for a successful medical malpractice claim under Puerto Rico law, as previously discussed.

### Dr. Hausknecht's Opinion

Plaintiff's second expert witness is neurologist Dr. Allan Hausknecht. His opinion provides even more tenuous grounds on which to anchor plaintiff's malpractice claim, since it is clear from both his report and his deposition that Dr. Hausknecht's opinion as to Dr. Gonzalez's negligence is derived entirely from Dr. Nathanson's report. The only thing which seems clear from Dr. Hausknecht's report is that the plaintiff is severely brain damaged and suffers from multiple medical problems. Plaintiff's condition is not questioned by anyone; what is under fire is the reason for those medical problems. In that regard, Dr. Hausknecht's opinion is unenlightening, as he offers no relevant independent evaluation of his own. Whereas Dr. Nathanson deferred to the neurologist on the question of the nexus between postdatism and plaintiff's damages, the neurologist defers to Dr. Nathanson on that same issue. Clearly, this kind of circular argumentation cannot be enough to satisfy plaintiff's burden of proof in a medical malpractice suit.

Plaintiff's case faces yet another obstacle: the battery of tests performed on plaintiff which show the presence of a cytomegalovirus infection which may explain the etymology of plaintiff's condition. Certainly the results of these tests provide evidence more compelling than the mere speculation and conjecture presented by plaintiff's experts. Defendants offer another possible cause for plaintiff's ailments; one that is not effectively countered by plaintiff, and is not even mentioned by his own experts. What the true etymology of plaintiff's condition is, no one may ever really know; however, what the Court can indeed determine is that plaintiff has once more failed to meet his burden of proof.

After close perscrutation of the record, the law, and the pertinent caselaw, and upon consideration of both parties' arguments, the Court finds that the entry of summary judgment in favor of defendants is warranted, because plaintiff was not able to offer any evidence to establish the three crucial elements for a successful malpractice suit. Plaintiff failed to establish the national standard of care applicable in this case; the opinions of his experts proved inadequate to explain why Dr. González's reliance on pelvic examinations, the patient's own word, and her past gynecological record, breached his duty of care, or was in any way unreasonable.

Plaintiff also failed to provide any proof that would tend to refute the presumption that Dr. González observed a reasonable degree of care in his treatment of Ms. Cortés. Dr. Nathanson's assertion that he would have ordered a sonogram to confirm the fetal age is just that, another doctor's assertion that had he been in the defendant's place he would have acted different. However, as we have seen, this falls far short of demonstrating that Dr. González's negligence is the main probable cause of plaintiff's damages. Plaintiff also fails to offer any evidence whatsoever regarding the required nexus between the physician's negligence and the patient's injury, since both his experts decline to offer an opinion about causality, and instead point to each other for it.

### IV

### Disposition

For the above stated reasons the Count finds that there are no genuine issues of

---

fingers, toes, and umbilical cord; long nails; unusual alertness; appearance of recent weight loss; and dry, flaking skin.

material fact in controversy, and since plaintiff's proof is clearly insufficient to carry his burden of proof at trial, the Court **GRANTS** defendants' motion for summary judgment (**Docket No. 57**). Judgment dismissing the complaint in the above captioned case will be entered accordingly.

**SO ORDERED.**