USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 96-1894 RAFAELA CORT S-IRIZARRY, Plaintiff, Appellant, v. CORPORACI N INSULAR DE SEGUROS, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Salvador E. Casellas, U.S. District Judge] ___________________ _________________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ _________________________ David Efron, with whom Kevin G. Little was on brief, for ___________ ________________ appellant. Elisa M. Figueroa B ez, with whom Law Offices of Sigrid ________________________ ______ Lopez Gonzalez was on brief, for appellees. ______________ _________________________ April 16, 1997 _________________________ SELYA, Circuit Judge. Plaintiff-appellant Rafaela SELYA, Circuit Judge. ______________ Cort s-Irizarry (Cort s), suing on behalf of her minor child, Rafael Jos Mu iz Cort s (Jos ), challenges an order granting summary judgment to Corporaci n Insular de Seguros (CIS) and its insured, Juan Ram n Gonz lez Aristud (Dr. Gonz lez), in a medical malpractice action. See Irizarry v. CIS, 928 F. Supp. 141, 147- ___ ________ ___ 48 (D.P.R. 1996). We vacate the order and remand for trial. I. BACKGROUND I. BACKGROUND Although the accepted summary judgment protocol calls for us to cast the facts in the light most complimentary to the plaintiff's position, consistent with record support, see, e.g., ___ ____ Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990), we _______ ________________ temper that protocol here to the extent that we set off, as point and counterpoint, conflicting evidence where the clash helps to illuminate pertinent legal issues. For simplicity's sake we omit any further reference to CIS and treat its insured as if he were the sole defendant. Dr. Gonz lez, a specialist in obstetrics, provided prenatal care to Cort s after she became pregnant with Jos . On December 15, 1979, Cort s related to Dr. Gonz lez that her last menstrual cycle prior to conception began on November 2 and lasted only two days. The length of her immediately preceding menses was three days, and her periods typically had lasted two or three days during the year prior to her current pregnancy. Based on this data, Dr. Gonz lez calculated Cort s' estimated delivery date (EDD) to be August 9, 1980. He delivered Jos by 2 cesarean section on July 30, 1980. The newborn weighed eight pounds, eight and three-quarter ounces (two pounds more than Cort s' first child) and exhibited no fetal distress. According to the defendant's computations, Cort s was in her thirty-ninth week of pregnancy when the baby arrived. This calculation forms the nub of the case. The plaintiff's theory is that Dr. Gonz lez misfigured the baby's fetal age and, consequently, allowed the pregnancy to continue beyond forty-two weeks, thus bringing into play a risk factor known as "post- datism" or "post-maturity." A post-dated fetus is at risk of oxygen deprivation during its extended stay in the mother's womb, and brain damage is a predictable result. While Jos , at birth, displayed no detectable symptoms suggesting a post-dated delivery, the circumstances of the delivery revealed some indications of potential perinatal difficulties; for instance, the cesarean section took twenty-one minutes (roughly twice as long as the norm), and, on one view of the proof, a tracheal catheter was used to intubate the newborn.1 Time resolved these mixed signals. Jos showed signs of neurologic abnormality at three months and was diagnosed with  ____________________ 1Other contemporaneous indicators were inscrutable. On the one hand, Jos had a relatively high Apgar score. An Apgar score is comprised of five components: heart rate, respiratory effort, muscle tone, reflex irritability, and color. It usually is compiled by the anesthesiologist at one minute after the delivery and again at the five-minute mark. A low score is generally thought to have predictive value in determining brain damage. On the other hand, testing at birth revealed a somewhat elevated serum bilirubin level (which could indicate an incipient metabolic problem). 3 impaired motor development and hearing loss at fourteen months. His condition worsened as the years passed. As an adolescent, he was diagnosed as severely brain damaged, epileptic, and profoundly deaf. At that juncture, Cort s, then a citizen of Florida, sued Dr. Gonz lez in Puerto Rico's federal district court, see 28 U.S.C. 1332(a) (diversity jurisdiction), alleging ___ that the physician's negligence caused her son's infirmities. Cort s' case rests primarily on the opinions of two experts. An obstetrician, Dr. Bernard Nathanson, opined that a competent obstetrician, rather than relying upon a reported two- day menstrual period to calculate a gravid woman's EDD, would have launched a more detailed gynecologic investigation. Had Dr. Gonz lez done so, the witness stated, he would have discovered that Cort s' actual EDD was July 9, 1980, and he would have recognized that a substantial risk of post-datism arose when her pregnancy extended past the EDD (a risk which he presumably could have negated by performing the cesarean section earlier). In reaching these conclusions, Dr. Nathanson stressed the unusual brevity of the reported period (especially as contrasted with Cort s' previous menses) and Dr. Gonz lez' failure to confirm the EDD by performing various tests which the witness stated were available in 1979-1980 (e.g., a B-scan ultrasound examination). In Dr. Nathanson's opinion, the pregnancy was post-dated, and the defendant's failure to realize it and take corrective action violated the prevailing standard of care. Dr. Nathanson also disputed Dr. Gonz lez' assertion 4 that he in fact performed a manual pelvic examination at Cort s' initial appointment and subsequently measured her uterus throughout her pregnancy to corroborate the EDD. Dr. Nathanson saw no evidence that these steps had been taken. Moreover, Dr. Gonz lez' office record did not mention either the periodic uterine measurements or their results. Although some of Cort s' prenatal charts apparently had been lost, Dr. Nathanson stated that these data "are so vital that they should be in [Dr. Gonz lez'] record in any case had he done them." The plaintiff's second expert, Dr. Allan Hausknecht, a neurologist, diagnosed Jos as suffering from Lennox Gasteault Syndrome (LGS). This neurological condition is caused roughly fifty percent of the time by perinatal brain damage (resulting from a lack of sufficient oxygen to the fetal brain). Doctor Hausknecht stated that, in his experience, this percentage increases sharply when, as in this instance, no evidence of any other known cause exists. Noting that the gradual development of Jos 's condition was characteristic of a post-mature fetus, Dr. Hausknecht rendered an opinion that Jos 's brain damage resulted from the post-datism which Dr. Nathanson had identified. This opinion was bolstered in some degree by Dr. Nathanson's statement that, while some post-dated infants will show immediate signs of placental senescence, such as meconium-stained amniotic fluid or peeling of the skin (Jos had neither), many others will appear asymptomatic at birth yet manifest the effects of post-datism at a later time. 5 To be sure, the plaintiff's evidence was hotly contested. The defendant claimed that he had figured the EDD accurately and that many of the tests suggested by Dr. Nathanson were unnecessary, or impracticable, or both. He also presented experts who offered an alternative theory of causation: intrauterine cytomegalovirus (CMV) infection, a rare condition which occurs in 0.2 to 2.2 percent of all live births. The results of blood tests performed on Jos at age fifteen revealed previous or latent CMV infection, but did not indicate whether the infection had been contracted in utero. This is a significant omission because, while infants who suffer from CMV may be asymptomatic at birth and thereafter develop mental retardation or deafness, CMV can be transmitted in various ways and affects most individuals during their lifetimes. II. THE SUMMARY JUDGMENT STANDARD II. THE SUMMARY JUDGMENT STANDARD A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We have expounded this standard and its particulars in a symphony of cases, see, e.g., McCarthy v. Northwest Airlines, ___ ____ ________ ___________________ Inc., 56 F.3d 313, 315 (1st Cir. 1995) (collecting cases), and we ____ refrain from rehearsing this jurisprudential chorus here. For our purposes, it suffices briefly to describe the rule's operation. 6 The objective of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. _____ Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992). To ________________________ defeat a motion for summary judgment, the nonmoving party must demonstrate the existence of a trialworthy issue as to some material fact. See Coyne v. Taber Partners I, 53 F.3d 454, 457 ___ _____ _________________ (1st Cir. 1995). A fact is "material" if it potentially could affect the suit's outcome. See Garside, 895 F.2d at 48. An ___ _______ issue concerning such a fact is "genuine" if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor. See National ___ ________ Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.), ________________ ______________ cert. denied, 115 S. Ct. 2247 (1995). _____ ______ Exercising de novo review, see Coyne, 53 F.3d at 457, ___ _____ we hold that the record in this case presents triable issues as to whether Dr. Gonz lez violated his duty of care, and, if so, whether his actions caused Jos 's injuries. Consequently, the district court erred in granting the motion for brevis ______ disposition. III. ANALYSIS III. ANALYSIS We first survey the junction where summary judgment principles and the standards governing the admissibility of expert scientific evidence intersect. We then evaluate the lower court's ruling. 7 A. A. __ The defendant asserts on appeal that the entry of judgment should be affirmed because the district court had the power to exclude the plaintiff's expert evidence pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 _______ ___________________________________ (1993), and that, without such evidence, the plaintiff has no case. Cort s parries this thrust by contending that Daubert does _______ not apply at the summary judgment stage. The truth lies somewhere in between. The Daubert Court formulated a regime for use in _______ ascertaining the admissibility of expert scientific evidence under Fed. R. Evid. 702.2 This regime contemplates that trial judges will perform a gatekeeping function, determining "whether the reasoning or methodology underlying [proffered expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93; see United States v. _______ ___ ______________ Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993) (discussing this _________ function).  ____________________ 2The rule stipulates: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or eduction, may testify thereto in the form of an opinion or otherwise. Fed. R. Evid. 702. 8 The plaintiff posits that Daubert is strictly a time- _______ of-trial phenomenon. She is wrong. The Daubert regime can play _______ a role during the summary judgment phase of civil litigation. If proffered expert testimony fails to cross Daubert's threshold for _______ admissibility, a district court may exclude that evidence from consideration when passing upon a motion for summary judgment. See Cavallo v. Star Enter., 100 F.3d 1150, 1159 (4th Cir. 1996), ___ _______ ___________ petition for cert. filed, 65 U.S.L.W. 2399 (U.S. Mar. 19, 1997) ________ ___ _____ _____ (No. 96-1493); Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, __________ ______________________ 297-99 (8th Cir. 1996), petition for cert. filed, 65 U.S.L.W. ________ ___ _____ _____ 3539 (U.S. Jan. 29, 1997) (No. 96-1212); Claar v. Burlington _____ __________ N.R.R., 29 F.3d 499, 502-05 (9th Cir. 1994); Porter v. Whitehall ______ ______ _________ Lab., Inc., 9 F.3d 607, 612, 616-17 (7th Cir. 1993). __________ The fact that Daubert can be used in connection with _______ summary judgment motions does not mean that it should be used profligately. A trial setting normally will provide the best operating environment for the triage which Daubert demands. Voir _______ ____ dire is an extremely helpful device in evaluating proffered ____ expert testimony, see Sepulveda, 15 F.3d at 1184 n.15, and this ___ _________ device is not readily available in the course of summary judgment proceedings. Moreover, given the complex factual inquiry required by Daubert, courts will be hard-pressed in all but the _______ most clearcut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that Daubert imposes, the Daubert _______ _______ regime should be employed only with great care and circumspection 9 at the summary judgment stage. We conclude, therefore, that at the junction where Daubert intersects with summary judgment practice, Daubert is _______ _______ accessible, but courts must be cautious except when defects are obvious on the face of a proffer not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility.3 See ___ Margaret A. Berger, Procedural Paradigms for Applying the Daubert _____________________________________________ Test, 78 Minn. L. Rev. 1345, 1379-80, 1381 (1994). ____ Having rejected the plaintiff's broadcast contention that Daubert can never be used at the summary judgment stage, we _______ turn to the defendant's case-specific argument that Daubert _______ necessitates the exclusion of the opinions advanced by the plaintiff's experts. This asseveration suffers from a very basic shortcoming: the defendant never asked the district court to exclude this evidence from consideration, and the district court made no effort to do so on its own initiative. If trial courts should be slow to employ Daubert at the summary judgment stage, _______ appellate courts should be even more hesitant to head in that  ____________________ 3Though such an opportunity is most easily afforded at trial or in a trial-like setting, courts have displayed considerable ingenuity in devising ways in which an adequate record can be developed so as to permit Daubert rulings to be made in _______ conjunction with motions for summary judgment. See, e.g., Brown ___ ____ _____ v. SEPTA (In re Paoli R.R. Yard PCB Litig.), 35 F.3d 717, 736, _____ _________________________________ 739 (3d Cir. 1994) (discussing use of in limine hearings), cert. __ ______ _____ denied, 115 S. Ct. 1253 (1995); Claar, 29 F.3d at 502 (discussing ______ _____ district court's technique of ordering experts to submit serial affidavits explaining the reasoning and methodology underlying their conclusions). We do not in any way disparage such practices; we merely warn that the game sometimes will not be worth the candle. 10 direction where there has been no development of the issue below. After all, the bifurcated inquiry into reliability and relevance which Daubert requires is best performed by trial judges who, _______ unlike appellate judges, have a broad array of tools which can be brought to bear on the evaluation of expert testimony.4 Hence, we can envision few, if any, cases in which an appellate court would venture to superimpose a Daubert ruling on a cold, poorly _______ developed record when neither the parties nor the nisi prius court has had a meaningful opportunity to mull the question. This case falls squarely into the maw of these general principles. The defendant, notwithstanding the animadversions that he spouts on appeal, never asked in the district court to strike or otherwise defenestrate the statements of Drs. Nathanson and/or Hausknecht. The district court's rescript neither cites Daubert nor purposes to exclude the expert evidence submitted on _______ the plaintiff's behalf. And, moreover, the record as it stands is wholly inadequate to permit a reasoned Daubert determination. _______ For these reasons, we decline the defendant's odd invitation that we start from scratch and undertake a Daubert analysis in the _______  ____________________ 4It is for this reason, coupled with the special coign of vantage which trial courts enjoy, that we have afforded district judges broad discretion in determining whether particular scientific testimony is or is not admissible at trial. See Hoult ___ _____ v. Hoult, 57 F.3d 1, 5 (1st Cir. 1995); Sepulveda, 15 F.3d at _____ _________ 1183. In this vein, we note that the Supreme Court soon will resolve a disagreement among the circuits as to the appropriate standard for reviewing such decisions. See Joiner v. General ___ ______ _______ Elec. Co., 78 F.3d 524 (11th Cir. 1996), cert. granted, 65 __________ _____ _______ U.S.L.W. 3619 (U.S. Mar. 17, 1997) (No. 96-188). That standard- of-review question need not concern us today. 11 context of this appeal.5 This means, of course, that we must consider the entire record, including the opinions of Drs. Nathanson and Hausknecht, as we ponder the merits of the district court's dispositive ruling. B. B. __ In this diversity suit, the substantive law of Puerto Rico controls. See Erie R.R. v. Tompkins, 304 U.S. 64, 78 ___ __________ ________ (1938); Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 ______________ ________________________ (1st Cir. 1993). The Puerto Rico Civil Code states that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, 5141 (1991). Under this proviso, three elements comprise a prima facie case of medical malpractice; a plaintiff must establish (1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus  ____________________ 5In all events, we note that the two grounds urged by the defendant in support of his exclusionary request are inappropriate. First, Dr. Gonz lez asserts that his expert evidence is more persuasive than the plaintiff's. His insistence that this circumstance warrants exclusion of the competing expert evidence contradicts fundamental principles of summary judgment practice. See, e.g., Greenburg v. Puerto Rico Maritime Shipping ___ ____ _________ _____________________________ Auth., 835 F.2d 932, 936 (1st Cir. 1987). Daubert does not _____ _______ reverse these principles. See Daubert, 509 U.S. at 595-96; see ___ _______ ___ also Ambrosini v. Labarraque, 101 F.3d 129, 140-41 (D.C. Cir. ____ _________ __________ 1996), petition for cert. filed, ___ U.S.L.W. ___ (U.S. Apr. 1, ________ ___ _____ _____ 1997) (No. 96-1552). Second, he claims that the testimony of the plaintiff's witnesses, if allowed, would be confusing. The fact that particular expert evidence might tend to confuse or mislead a jury can constitute grounds for exclusion of the evidence at trial, see Fed. R. Evid. 403, but it is not directly relevant to ___ a Daubert analysis. See Daubert, 509 U.S. at 595-96. _______ ___ _______ 12 between the breach and the claimed harm. See Lama v. Borras, 16 ___ ____ ______ F.3d 473, 478 (1st Cir. 1994); Rolon-Alvarado, 1 F.3d at 77. On ______________ whole-record review, we conclude that the plaintiff produced sufficient evidence to establish a genuine factual controversy as to each element. 1. Duty and Breach. In this case, the elements of 1. Duty and Breach. _______________ duty and breach are inextricably intertwined. Thus, we address them in the ensemble. Puerto Rico holds health care professionals to a national standard of care. See Oliveros v. Abreu, 101 P.R. Dec. ___ ________ _____ 209, 226-27, translated in 1 P.R. Sup. Ct. Off'l Trans. 293, 313 __________ __ (1973). Accordingly, a health care provider has "a duty to use the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances, regardless of regional variations in professional acumen or level of care." Rolon- ______ Alvarado, 1 F.3d at 77-78. Nevertheless, because Puerto Rico law ________ presumes that physicians exercise reasonable care, a plaintiff bent on establishing a breach of a physician's duty of care ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it. See id. at 78. ___ ___ Cort s' proffer is sufficient to this end. Dr. Nathanson, a specialist in the same field as Dr. Gonz lez, clearly delineated the standard of care and identified what he believed to be Dr. Gonz lez' departures from it. He stated 13 categorically that an "average gynecologist" would not rely on a reported two-day menstrual period unusually short even if relatively common to that particular individual and that the failure to perform corroborating tests then available violated "the prevailing medical standard." For purposes of summary judgment, affiants and witnesses need not be precise to the point of pedantry. Thus, we treat Dr. Nathanson's references to the "average gynecologist" and to "the prevailing medical standard" as meaning the national standard of care. Cf. Lama, 16 F.3d at ___ ____ 479 n.7. The district court advanced three principal grounds in support of its conclusion that these issues duty and breach  could be resolved against the plaintiff at the summary judgment stage, notwithstanding Dr. Nathanson's opinion evidence. All of these grounds lack persuasive force. First, the court observed that Cort s' menstrual periods had lasted "an average of two to three days," and, accordingly, "a two-day period was not abnormal or unusually short for her." Irizarry, 928 F. Supp. at 146. But Dr. ________ Nathanson's testimony supported the opposite conclusion; thus, whether the menses was abnormal and whether it triggered a duty to inquire further became questions of fact not properly resolved on summary judgment. See, e.g., Greenburg v. Puerto Rico ___ ____ _________ ____________ Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). _______________________ Second, the court determined that, because Dr. Gonz lez measured the uterus periodically throughout the pregnancy, 14 yielding results consistent with the EDD on which he relied, he had no reason to suspect an earlier date of conception or to order any additional tests. See Irizarry, 928 F. Supp. at 146. ___ ________ While Dr. Gonz lez so testified, the court erred in treating that testimony as conclusive. When Dr. Gonz lez' and Dr. Nathanson's assertions are juxtaposed, the net result is a factual issue as to whether the defendant made the measurements, and, if so, whether this procedure satisfied the applicable standard of care. Third, the court damned Dr. Nathanson's opinion with the faintest of praise, characterizing it as nothing more than one doctor's assertion that he would have acted differently in identical circumstances than did another, and, consequently, denying it effect in the summary judgment calculus. See id. at ___ ___ 147. We accept the court's premise that a mere disagreement in medical judgment, without more, does not prove duty or breach in a medical malpractice case brought under Puerto Rico law. See ___ Rolon-Alvarado, 1 F.3d at 78. But we reject the court's ______________ conclusion; Dr. Nathanson's declarations, read in context, amount to a satisfactory statement of the standard of care and the defendant's deviation from it which, if credited by a jury, could support a finding for the plaintiff on these elements of her cause of action. And in the absence of a Daubert determination _______ excluding the Nathanson evidence as scientifically untenable, the trial court was not at liberty on summary judgment to ignore that evidence merely because it deemed other evidence more credible. 2. Causation. Notwithstanding proof of both duty and 2. Causation. _________ 15 breach, a plaintiff also must offer competent evidence of causation in a medical malpractice case. See Rolon-Alvarado, 1 ___ ______________ F.3d at 77. The lower court found the plaintiff's submissions on this element wanting. See Irizarry, 928 F. Supp. at 147. We ___ ________ demur. A medical malpractice plaintiff can and often does  establish causation through expert testimony. See Lama, 16 F.3d ___ ____ at 478. Cort s took that route. Dr. Nathanson offered an opinion to a reasonable degree of medical certainty that Cort s' EDD was actually July 9, not August 9, and that this one-month discrepancy had dire consequences. If accepted, this testimony meant that Dr. Gonz lez did not perform the cesarean section until the forty-third week of a post-dated pregnancy. Relatedly, Dr. Hausknecht diagnosed Jos as suffering from LGS, which, in the absence of any genetic or other known explanation, is generally thought to be caused by perinatal brain damage. It is undisputed that the adverse effects of post-datism include oxygen deprivation, and thus can lead to brain damage. Finding no evidence of any hereditary etiology and observing a pathology consistent with post-datism, Dr. Hausknecht opined that Jos 's cerebral damage probably was caused by the post-datism which Dr. Nathanson identified. Both physicians also noted likely indications of complications at birth, and these findings buttress the plaintiff's theory of causation.6 Drawing  ____________________ 6Dr. Nathanson dwelled on the unusual duration of the cesarean section and the apparent use of a tracheal catheter to resuscitate the infant at birth. Dr. Hausknecht noted that there 16 reasonable inferences from this evidence, a rational jury could find that Dr. Gonz lez' negligent reliance upon a reported two- day menstrual period and his eschewal of further (available) tests caused a post-dated pregnancy, the effects of which included perinatal brain damage which manifested itself in the form of LGS. Of course, the defendant's experts debunked the plaintiff's proof and offered an alternative causal theory the presence of a CMV infection which the district court found "more compelling." Irizarry, 928 F. Supp. at 147. But such ________ comparisons are invidious at the summary judgment stage. Even at trial, a plaintiff in a medical malpractice suit need not prove a causal connection with mathematical accuracy nor eliminate all other possible causes of damage. See Cruz Rodriguez v. ___ _______________ Corporaci n de Servicios del Centro M dico, 113 P.R. Dec. 719, ____________________________________________ 744, translated in 13 P.R. Sup. Ct. Off'l Trans. 931, 960-61 __________ __ (1983). Legal rules of this sort acquire added significance on summary judgment because Rule 56 "contemplates an abecedarian, almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and the most flattering inferences which can reasonably be drawn therefrom are sufficient to create any authentic question of material fact." Greenburg, _________ 835 F.2d at 936. In this case, the defendant's evidence on the issue of  ____________________ had been an abnormal bilirubin level at birth and expressed a belief that this might evince a metabolic problem damaging the brain. 17 causation, as compelling as it might have seemed, did not warrant the entry of summary judgment. The plaintiff articulated an alternative theory of causation and backed it up with expert testimony as to the causal nexuses between LGS and perinatal damage, and between perinatal damage and post-datism. At the same time, she cast doubt on the defendant's theory of causation, establishing the low incidence of intrauterine CMV infection and suggesting an alternate origin of any CMV detected in Jos 's system (related to a history of sexual molestation at school, thereby opening up the possibility that any CMV infection was sexually transmitted). This evidence sufficed to create a trialworthy issue vis- -vis the element of causation. See Coyne, ___ _____ 53 F.3d at 460 (explaining that "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage"); see also United States v. Kayne, 90 F.3d 7, 12 ___ ____ _____________ _____ (1st Cir. 1996) (stating that disagreements among experts are "properly the subject of searching cross-examination" at trial), cert. denied, 117 S. Ct. 681 (1997). _____ ______ III. CONCLUSION III. CONCLUSION We need go no further. Scrutinizing the entire record in the light most congenial to the plaintiff, rational jurors could find all the elements of medical malpractice. Though the plaintiff's evidence may appear thin to some, it establishes factual disagreements as to which reasonable minds may differ. No more is exigible. See Greenburg, 835 F.2d at 936 (explaining ___ _________ 18 that the ground rules associated with summary judgment practice "admit of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record"). Right or wrong, the plaintiff is entitled to present her case to a jury. The order granting summary judgment is vacated and the The order granting summary judgment is vacated and the _______________________________________________________ case is remanded for trial. Costs to appellant. case is remanded for trial. Costs to appellant. __________________________ __________________ 19