Klonoski v. Mahlab                    CV-95-153-M    05/05/97
                    UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW HAMPSHIRE


Estate of Jolanta K. Klonoski,
     Plaintiff,

     v.                                        Civil No. 95-153-M

Benjamin Mahlab, M.D.;
Hitchcock Clinic, Inc.; and
Mary Hitchcock Memorial Hospital, Inc.,
     Defendants.


                            O R D E R


     This medical malpractice case arises from Jolanta Klonoski's

death while a maternity patient at the Dartmouth-Hitchcock

Medical Center in Hanover, New Hampshire.  Jurisdiction is based

upon diversity of citizenship.

     The case was tried to a jury, and a verdict was returned in

favor of the defendants.  The plaintiff estate now moves for a

new trial (document no. 136) under Federal Rule of Civil

Procedure 59, asserting two basic grounds.  First, plaintiff says

the jury's verdict was against the clear weight of the evidence.

Second, plaintiff says the interests of justice warrant a new

trial because particular evidence presented to the jury was

unfairly prejudicial.


I.   Is the verdict against the clear weight of evidence?

Had this been a bench trial, the court would have reached a conclusion different from that represented by the jury's verdict. But the case was not tried to the court, and, in the end, defendants are quite right in saying that the critical fact issues turned on conflicting medical opinion evidence. The critical issues, for purposes of the pending motion, were not whether the treating physician, Dr. Mahlab, met the applicable standard of care in all respects (defendants conceded that he did not), or whether some of the attending nurses behaved unprofessionally and inappropriately when, despite their belief that Mrs. Klonoski was severely preeclamptic, in dire straits, and not receiving adequate medical care from Dr. Mahlab, they inexplicably failed to seek help from a supervising physician designated by hospital policy to assist in precisely that type of situation. (Though not conceded by defense counsel, it is apparent to the court that, in general, the nurses attending Mrs. Klonoski did not act either professionally or in her best interests.)

Rather, the critical fact issues were whether Mrs. Klonoski's intracerebral hemorrhage, the cause of her death, was the result of a preeclamptic hypertensive bleed substantially caused by inadequate medical care, or the result of an unanticipated arteriovenous malformation ("AVM") rupture. And,

if death was the result of an AVM rupture, whether Dr. Mahlab's failure to adequately treat Mrs. Klonoski's preeclampsia substantially caused or contributed to cause either the AVM rupture itself, or the fatal extent of her subsequent brain hemorrhage.

"Proof of causation is . . . more difficult in a medical malpractice case than in a routine tort case because a jury must often grapple with scientific processes that are unfamiliar and involve inherent uncertainty." Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994). Proof of causation in this case was essentially analytical in nature; the jury was particularly dependent upon expert opinion testimony in resolving the medical fact issues. Both parties presented very highly qualified, experienced, and knowledgeable medical experts — experts who fundamentally disagreed as to the cause of death, but who generally agreed that their opinions necessarily derived from analytical judgments regarding medical probabilities, and that no one could say for certain what caused Mrs. Klonoski's death.[1]

The jury apparently chose to believe that defendants' experts were more likely correct in concluding that Mrs. Klonoski's death resulted from an unanticipated AVM rupture,

---

[1] Because no autopsy was performed there was no conclusive evidence of the existence or absence of a ruptured AVM.

3

either coincidentally or due to the stresses of pregnancy itself, but not due to any deficiency in Dr. Mahlab's medical treatment of her preeclampsia. Or, perhaps the jury determined that notwithstanding some relationship between Mahlab's malpractice and the extent of the AVM bleed — the bleed would have occurred and its size would have been fatal even absent additional bleeding caused by Dr. Mahlab's malpractice. Of course, the jury also could have decided that the medical experts' disagreement established, if anything, that both plaintiff's and defendants' causal theories were equally plausible and, thus, plaintiff failed to meet its burden of persuasion on causation.

As noted, the court would have decided the medical fact issues differently, but the court is in no better position than the jury to decide those open and contested fact issues. This is not a case in which the evidence, particularly in light of the opposing medical opinions, resoundingly favored one side or the other. One's view of the evidence as a whole necessarily turns upon one's assessment of the credibility, reliability, and persuasiveness of the medical experts, and that function is well suited to a jury's collective wisdom and judgment.

The court cannot in good conscience say that the verdict was against the great weight of the credible evidence presented, or that the jury was seriously mistaken to the extent it found the

4

opposing medical experts equally credible, or found defendants'
experts more credible.  While a judge's discretion to order a new
trial was at one time considered virtually unlimited, and is
still sometimes referred to as "great," in reality the exercise
of that discretion has limits — it "must be exercised with due
regard to the rights of both parties to have questions which are
fairly open resolved finally by the jury at a single trial."
Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir. 1982)
(citations and explanatory footnote omitted).  The critical
liability questions in this case were "fairly open."

Recognizing that "the [trial] judge's duty is to exercise a
more limited discretion" and he or she "should not interfere with
the verdict 'unless it is quite clear that the jury has reached a
seriously erroneous result,'" I must deny the motion for new
trial. Coffran, 683 F.2d at 6 (quoting Borras v. Sea-Land Serv.
Inc., 586 F.2d 881, 887 (1st Cir. 1978)).  I cannot say on this
record that the verdict was against the clear weight of the
evidence, though I do disagree with the verdict.[2]  See Coffran,

_____

[2] Plaintiff also seems to argue, without much elaboration
or reference to any legal authority, that the jury's verdict
surely must be seen as against the clear weight of the evidence
at least to the extent that Dr. Mahlab's conceded breaches of
duty necessarily caused some compensable pain and suffering, or
prolongation of pain and suffering (related to decedent's
mistreated severe preeclampsia) that otherwise would not have
occurred had he provided adequate care.  Although the issue was
not raised by plaintiff before or during trial, and has not been

683 F.2d at 6 (trial judge should not set a verdict aside just because he or she would have reached a different result in a bench trial); Freeman v. Package Machinery Co., 865 F.2d 1331, 1334 (1st Cir. 1988) ("If the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were he sitting jury-waived, would likely have found the other way."); Milone v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988) ("[A] trial judge cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial.").

## II.  The Interest of Justice

Plaintiff raises several arguments under this heading, but they too are unavailing.  Taking the points in order, the court rules as follows.

### A.    Duration of Jury Deliberation

---

adequately briefed by plaintiff now, the short answer would seem to be that "[a]t common law there was no action for wrongful death nor did tort actions for [personal] injuries survive." Costoras v. Noel, 101 N.H. 71 (1957) (citations omitted). Therefore, if plaintiff is claiming that the verdict is against the weight of the evidence because the evidence unquestionably established breaches of duty by Dr. Mahlab which proximately caused personal injury to Mrs. Klonoski before her death in the nature of unnecessary pain and suffering related to preeclampsia, that tort claim did not survive Mrs. Klonoski's death.  (The wrongful death claim, however, is statutorily allowed.)

The court is not persuaded that the jury's deliberation was inappropriately short, or that the two plus hours of deliberation necessarily indicates, much less establishes, that the jury failed to follow the court's instructions. The jury heard a great deal of testimony but, as discussed above, the causation issue was critical. The jury could easily have focused on that issue first, determining after a short while that it was in agreement with defendants' experts. Or, it could have agreed that, given the plausible medical opinions on each side, plaintiff simply did not meet its burden of proof on causation.

B.    **Undisclosed Marital Evidence**

Decedent's husband, Dr. Richard Klonoski, took the stand to testify that while his marriage had not been perfect, it had been, overall, a strong, healthy and happy one, and would likely have continued to be strong into the future. Plaintiff also introduced family photographs and a brief family video to support that contention. The video, redacted in part after court review, depicted a recent family wedding, just before Mrs. Klonoski died, at which Dr. and Mrs. Klonoski were shown in church and later dancing together at the reception.

This evidence was offered by plaintiff on the issue of hedonic damages — fair compensation for Mrs. Klonoski's loss of

7

enjoyment of life.  Without belaboring the record discussions on this issue, the court admitted the evidence for that limited purpose and fairly advised plaintiff's counsel that contradictory evidence — to show that the marriage was not all that wonderful — would also be admissible on hedonic damages.

Defendants' counsel represented to the court, on the record, that only after trial started did they discover and obtain copies of letters that were written by the decedent, close to the time of her death, that dramatically contradicted Dr. Klonoski's testimony about the marriage.  Investigators hired by defendants in Poland (Mrs. Klonoski's country of birth) obtained the letters from Mrs. Klonoski's sister, Marta.  The copies were faxed to New Hampshire and translated while Dr. Klonoski was testifying.  The letters, in their entirety, were quite contradictory — painting an entirely different picture of the Klonoski marriage than Dr. Klonoski had described.

The court asked plaintiff's counsel if she wished a continuance to respond to this late discovered evidence, but she declined.  Defendants were allowed to use only very limited excerpts from the letters to cross-examine Dr. Klonoski.  That is, the court identified specific statements in the letters that directly contradicted his testimony, but precluded use of most of the contents on grounds that the sentiments expressed and

8

language used might prove unfairly distracting.  Several times during the trial the court told both counsel that they seemed to be making much over a relatively small matter — whether the marriage was happy or unhappy would seem to say comparatively little about the decedent's <u>future</u> loss of enjoyment of life. But, <u>both</u> parties pursued the matter anyway under the guise of hedonic damages, plaintiff perhaps to engender some collateral sympathy and defendants to perhaps engender some collateral animosity.  So, the court took the added precaution of carefully explaining to the jury the very limited purpose of that evidence, giving the following pointed instruction after closing arguments (which the jury had in writing as well):

B.   Damages to the Estate of Jolanta Klonoski

1.   Calculation of Damages

In determining the amount to award as damages to the Estate of Jolanta Klonoski, you may consider the following items of loss or harm:

\*     \*     \*

4.   Reasonable compensation for Jolanta Klonoski's loss of enjoyment of life - past and future.

Ladies and gentlemen, as to this last item - loss of enjoyment of life, you have heard a fair amount of evidence related to alleged discord in the Klonoski marriage, and I want to make sure you understand what that evidence is relevant to, and what it is not relevant to - it is relevant only on the issue of damages, and even then, only in a limited way.  You should keep in mind that under applicable New Hampshire law, a cause of action (or a claim) based on someone's

9

allegedly wrongful death belongs to the decedent's estate, and does not belong to the decedent's surviving spouse or surviving children. So, in this case, if you find legal fault and are considering damages, the damages you award for Mrs. Klonoski's wrongful death are awarded to her estate. As I have instructed you, one among other factors you may consider in determining a proper award would be Mrs. Klonoski's loss of enjoyment of life, factor number 4 mentioned above. It is of course, <u>Mrs. Klonoski's</u> loss of enjoyment of life that you will be considering, not Dr. Klonoski's loss of enjoyment of life, and not their children's loss of enjoyment of life. Dr. Klonoski and the Klonoski children have no claims pending before you, and you must not award damages to them.

Now, to the extent you find, based on the evidence, that there was discord in her marriage you may take that into account and may give it such weight as you deem appropriate in fairly assessing the effect of marital discord on the loss of enjoyment of life Mrs. Klonoski suffered as part of your determination of a full and fair compensatory award. On the verdict form that you will be provided, I will ask you to break out, or designate, that part of any total compensatory award that represents the amount, if any, awarded for loss of enjoyment of life.

The court is satisfied that the jury fully understood and followed its instructions regarding the "marital discord" evidence.

Plaintiff's counsel suggests that had she known Mrs. Klonoski's letters existed and were so patently inconsistent with Dr. Klonoski's more favorable perceptions of the marriage, her trial strategy would have been different. But, she also says, as Dr. Klonoski said to the jury upon being recalled, his different perceptions were honestly held. The jury could certainly

10

appreciate the apparent difference in perception between Dr. and Mrs. Klonoski, and could have easily put the "marital discord" evidence in proper perspective had it reached the issue of hedonic damages.

The important points here are that the letters were in fact late discovered (nothing to the contrary has been shown); it was not unfair to permit defendants to use limited excerpts to cross-examine Dr. Klonoski about the marriage (to the extent that mattered in awarding hedonic damages), particularly given his own dramatic statements and video evidence on direct; the evidence was relevant to damages but only in a limited way; the jury never reached the damages issue; and, the jury was carefully instructed on the limited relevance of the "marital discord" evidence.

Under these circumstances, the court cannot conclude that the jurors returned a defendants' verdict because they were blindly prejudiced against Mrs. Klonoski's estate by her own negative comments about the quality of her marriage. The jurors may well have looked less favorably on Dr. Klonoski after the letters were brought to light, and his credibility in other respects might or might not have suffered, but he had no claim pending before the jury, and that fact was made very clear to the jury.

11

## C.    The Headache Evidence

Both sides presented evidence tending to show that Mrs. Klonoski suffered from headaches during the later stages of her pregnancy.  Defendants also presented witnesses who said Dr. Klonoski was aware of those headaches.

Plaintiff apparently wanted to show that Dr. Sailer (an original defendant who provided prenatal care) should have recorded those headaches in Mrs. Klonoski's medical records, and that, had he done so, Dr. Mahlab would likely have diagnosed the later preeclampsia in a timely fashion.  Defendants, on the other hand, wanted to show that Mrs. Klonoski did have headaches, that they were increasingly severe and frequent, and they were consistent with a subsequent AVM rupture.

Plaintiff seems to argue in its motion for new trial that the testimony regarding Dr. Klonoski's knowledge of Mrs. Klonoski's headaches was improperly admitted, and worse, was relied upon by defense counsel to subtly argue in closing that Dr. Klonoski was "contributorily negligent" in some manner (New Hampshire is a comparative fault state).

Plaintiff's counsel did not timely object to defense counsel's closing argument, so the issue is waived.  But putting waiver aside for discussion purposes, headache evidence was offered by defendants to show that their AVM hypothesis was both

12

supportable and supported. Defendants properly tried to prove that Mrs. Klonoski suffered from increasingly severe and frequent headaches, and that those headaches were symptoms consistent with "warning bleeds" that sometime precede an AVM rupture. The defendants' points were that an AVM rupture occurred, and, had they been told early on of the increasingly severe and frequent headaches, the course of Mrs. Klonoski's medical treatment might have differed — perhaps testing for a possible AVM might have been done, and, if an AVM had been found, perhaps an alternative delivery method would have been used in an effort to avoid an AVM rupture, or perhaps corrective surgery would have been recommended prior to decedent's giving birth. In short, Mrs. Klonoski's death in childbirth might have been averted. Defendants also suggested, properly, that perhaps the reason they were not told of the headaches was that neither Dr. Klonoski, who was aware of them, nor Mrs. Klonoski thought they were significant or unusual.

In any event, defense counsel did not argue "contributory negligence" in closing, and the evidence of Mrs. Klonoski's experiences with headaches and Dr. Klonoski's awareness of her headaches was properly admitted and was not unfairly prejudicial such that a new trial is warranted.

13

D.    **The Testimony of the Nurses**

Virtually all of the nurses employed by Dartmouth-Hitchcock Medical Center who were called to testify claimed varying degrees of forgetfulness regarding the relevant facts and circumstances surrounding Mrs. Klonoski's hospitalization and death. Excepting Nurse Bowers, the court perceived the nurses' trial testimony to be generally evasive, obfuscating, unreliable, and not credible. For reasons discussed in earlier orders in this case relative to privilege, and on the record at trial, the court permitted plaintiff's counsel to deal with this collective forgetfulness by introducing as full exhibits the comprehensive statements each nurse gave to the hospital's claims adjustor, Mr. Burke, as recorded by Burke during interviews he conducted shortly after Mrs. Klonoski's death.

Plaintiff argues for a new trial on grounds that the nurses' suspect trial testimony (presumably their claimed lack of memory) so unfairly prejudiced plaintiff's case as to warrant a new trial. In the court's view, the nurses' assertions of memory failure were indeed highly dubious. But, if they <u>had</u> remembered all that they once knew, it is unlikely that they would have had anything of a substantive nature to say at trial beyond what they said to Burke, the medical center's claims adjustor. The statements given to Burke were also likely to have been full and

14

candid, for the nurses undoubtedly recognized at the time that the hospital was attempting to determine exactly what had happened in order to protect against avoidable errors in the future. The statements themselves reveal that the nurses held, and freely expressed, very strong impressions and opinions about what had gone wrong and why. The statements were taken by Burke when memories were fresh and details were clear; certainly the statements give the impression of complete candor. Burke was also revealed, by plaitiff's counsel, to be an experienced and thorough investigator who at the time was acting on behalf of the medical center and hospital, the nurses' employer.

Plaintiff makes no proffer regarding what information any of the nurses might have offered, beyond what was contained in Burke's recordings, if their memories had been intact at trial. The nurses' full statements to Burke were not only allowed into evidence, but plaintiff's counsel was given wide lattitude in using them. She was permitted to read extensively from them, and she freely confronted the nurses, Burke, Dr. Mahlab, and other witnesses with them. It is difficult to see what more could have been done to overcome any possible prejudice from the nurses' claimed lack of memory and to reveal the facts to the jury as the nurses remembered them at the relevant time. A new trial is not

15

warranted on this ground, at least not as described, asserted, or supported by plaintiff in its motion.

## Conclusion

For the reasons discussed, the court declines to exercise its discretion to grant a new trial on the grounds asserted. Plaintiff's motion for new trial (document no. 136) is denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 5, 1997

cc:  Donald J. Williamson, Esq.
     Joan A. Lukey, Esq.
     James P. Bassett, Esq.

16